(112 App. Div. 39)

### PEOPLE v. WICKES.

(Supreme Court, Appellate Division, First Department. March 23, 1906.)

1. THREATS—ELEMENTS OF OFFENSE—EVIDENCE—SUFFICIENCY.

An attorney employed to prosecute an action for a contingent fee, wrote, under an assumed name, to defendant several letters, urging a settlement, and stating that a certified copy of the answers had been obtained, that they might be laid before a magistrate and an application made for a warrant for perjury, or the trial judge might send the answers to the district attorney, and inquiring whether he desired to have it known in the community that he had resorted to perjury, and averring that there was only one chance to escape conviction and that was to settle the case. *Held* to warrant the attorney's conviction of blackmail, it appearing that he attempted to obtain a settlement by threats of a prosecution for perjury and thereby obtain a fee.

2. SAME—DEFENSE.

It is no defense to a charge of blackmail that the crime threatened to be charged has been perpetrated, nor that accused has cause to believe that the crime has been committed or does believe it.

[Ed. Note.—For cases in point, see vol. 45, Cent. Dig. Threats, § 5.]

3. SAME.

An attorney employed to prosecute an unliquidated claim on a contingent fee wrote under an assumed name to defendant urging a settlement and threatening him with a prosecution for perjury. *Held*, that the privilege of an attorney did not constitute a defense to the attorney's prosecution for blackmail.

Appeal from Trial Term, New York County.

Thomas P. Wickes was convicted of blackmail, and he appeals. Affirmed.

Argued before O'BRIEN, P. J., and PATTERSON, INGRAHAM, LAUGHLIN, and CLARKE, JJ.

Delos McCurdy (Job E. Hedges, on the brief), for appellant.

William Travers Jerome, Dist. Atty. (Robert C. Taylor, of counsel), for the People.

CLARKE, J. In March, 1901, Dr. Ashbel P. Grinnell of Burlington, Vt., was arrested at the Grand Central Station in the city of New York as, with his wife, he was about to take a train for his home. The arrest was made because one Edward Weston had identified Dr. Grinnell as one Raymor, who had theretofore obtained certain sums of money from Weston by false representations. Dr. Grinnell's identity was soon established, and, after a short detention, he was released from custody. Thereafter Grinnell brought a civil action in the Supreme Court in this county against Weston for $50,000 for damages for said arrest. In the verified answer interposed in said action Weston alleged:

"That on or about March 23d, 1901, at the Grand Central Station in New York City, the defendant, being misled and deceived by said great resemblance and similarity, acting in the honest though mistaken belief that the plaintiff was the person who had committed the felony hereinbefore described, and without any malice whatsoever, caused the arrest of the plaintiff in order that said plaintiff might be carried and conveyed before the proper magistrate, to be there dealt with according to law."

The said action came on for trial, and resulted in a verdict for the plaintiff for $12,500. The defendant in the case at bar, an attorney at law, represented the plaintiff, Grinnell, in said action as counsel and actually conducted the trial. He was to receive for his services as counsel 25 per cent. of the verdict and one-half of the costs and allowances. On appeal, this court reversed the judgment entered on said verdict, and ordered a new trial. Grinnell v. Weston, 95 App. Div. 454, 88 N. Y. Supp. 781. The second trial was had in February, 1905, and a verdict for $10,000 was rendered for the plaintiff. The court reduced the amount to $5,000 and, the plaintiff, not consenting thereto, the verdict was set aside, and a new trial ordered. Weston at that time was in Florida. The defendant at bar had theretofore procured a lock box in the New York post office and had caused stationery to be engraved with the heading "Lewis Jarvis, Lock Box 1604, New York," and on said letter paper and over the signature, written by himself, of "Lewis Jarvis," he sent to Weston in Florida a letter, dated February 18, 1905. That letter stated, inter alia: ·

"My dear Commodore: Please pardon me for intruding upon your holiday. You have entertained me very handsomely in the past, and I would be glad to do you some service. May I write that many of your friends think you have pursued this lawsuit with Dr. Grinnell long enough? You must know you never can win the case. You admit that you caused the arrest. (at least that is the statement made in the answer, sworn to by you, which Mr. Mitchell prepared for you); * * *. The other jury gave $12,500. This jury gives $10,000. Would it do any good to appeal? Suppose you should succeed in setting this verdict aside also, would Dr. Grinnell be thereby prevented from

getting another verdict? Commodore, as long as your answer remains what it is, the case cannot be changed, and you could not alter your answer, so as to make it really different, effectively, and legally different, without running the risk of a prosecution for perjury. Then why not make an end of the case, Commodore? You have put up a splendid fight. No one could have done better for you than Mr. Osborne. I heard nine-tenths of this last trial, and I could not but admire his wonderful management of the defense, in spite of your absence. You were favored by good fortune too. Dr. Grinnell was very kind and generous toward you in his testimony, and then Senator O'Sullivan summed the case up on the plaintiff's side; if Mr. Wickes had made the final address to the jury I believe that the verdict would have been at least $20,000 against you. But the publicity given to the matter hurts your good name; all your friends here are saying so. The newspapers were full of it * * * Pray think of these suggestions, my dear Commodore, for your own sake, and consider them. Talk them over with your good wife, or any other disinterested friend. * * * But I rather imagine that I need only to give you the hint. Your own good sound sense and excellent judgment will do the rest."

Weston did not reply to this letter. On February 21, 1905, the defendant, upon paper with the same engraved heading, and over the same name of Lewis Jarvis, wrote again to Weston. Having first stated the motions which had been made, the letter proceeds:

"Do you want a new trial? Do you want to have all this dragged out again in March. Believe me, Commodore, it would be very bad for you. The only way you could avoid it would be to wire Osborne to withdraw his motion. Then, if the judge should deny Wickes' motion (and, between you and me, the judge will, for he told me that he would), the case could go up on appeal on a simple appeal from the judgment. But do you want to appeal again? The result, the final result, would be against you. It is bound to be while that awful answer, which Mr. Mitchell allowed you to swear to, remains in the case, and, as I wrote you before, you cannot now amend it; for any amendment, that is any amendment which would do you any good at all, as an answer, would really in the end, only involve you in more trouble, because you would have to swear to circumstances so diametrically opposite to what you have already sworn to, that you would run the risk of a prosecution for perjury. * * * Now, Commodore, why don't you settle the case? * * * Settle the case now, Commodore, for the sake of your own good name. You will never have a better opportunity than this."

This letter was not answered. On February 25, 1905, the defendant again wrote on the same paper and over the name of Lewis Jarvis: "I was in court Friday morning." Then followed an account of the court proceedings, and the letter continued:

"There, you see, Mr. Wickes gets the new trial he wanted. So, in March or April it will have to be gone into all over again, with a very good prospect of a verdict against you then of $20,000 or more. Commodore, your interests have not been very well looked after in this case, now have they? * * * Really, Commodore, you ought to have settled the case long ago. It is not too late now, but of course you would have to pay very much more now. Why don't you send Mr. Dorrian or some other man in whom you have confidence, to see Mr. Wickes, and try to come to terms with Dr. Grinnell at once; and then, when you come north, you can close the matter up for good and all."

Prior to the third trial in May, 1905, Weston verified and had served an amended answer in the suit of Grinnell v. Weston. Paragraph twenty-second thereof was as follows:

"That on or about the 22d day of March, 1901, this defendant, acting in the honest, though mistaken belief that the plaintiff was the person who had committed the felony hereinbefore described in the state of New York as

aforesaid, and without any malice whatsoever, pursuant to the aforesaid instructions from the said police department of the city of New York, notified the said police department of the whereabouts of the said Raymor, as this defendant in good faith supposed and believed, and on or about the 22d day of March, 1901, at the Grand Central Station in New York City, this defendant being misled and deceived by such great resemblance and similarity and acting in the honest though mistaken belief that the plaintiff was the person who had committed the felony hereinbefore described, and without any malice whatsoever, at the request of the said police department of the city of New York and its officers, identified the plaintiff herein as and being the said Raymor hereinbefore referred to, and this defendant alleges that the plaintiff was thereupon arrested, but not by this defendant but by the police department of the city of New York."

The defendant Wickes procured the filing of the original of this amended answer in the county clerk's office and obtained therefrom a certified copy. On the day before the third trial began Weston received from the defendant a letter dated May 15, 1905, on the same engraved letter paper as before described, as follows:

"Dear Commodore: I wrote you two or three friendly letters in February, but you appear to have paid no attention to them at all. Look what a spectacle you make of yourself with your two answers, both of which you swore to, on file in the court, because I see that they are both on file; and some one has obtained from the county clerk a certified copy of each. Maybe they are to be laid before a police magistrate, and an application made for a warrant for your arrest upon the charge of perjury. I do not know that any such thing is in contemplation, but a pretty good criminal complaint could be made against you—now—now, couldn't it?—rather better than the complaint which you got McConville to swear to four years ago when you had Grinnell arrested. In your answer filed March 28, 1903, you say in paragraph 18, 'that on or about March 23d, 1901, at the Grand Central Station in New York City, the defendant * * * caused the arrest of the plaintiff, in order that said plaintiff might be carried and conveyed before the proper magistrate, to be there dealt with according to law,' and you swore to this on the 17th day of May, 1901. In your amended answer, filed May 2, 1905, you say in paragraph fifteenth, 'that on or about the 22d day of March, 1901, this defendant * *, * at the Grand Central Station in New York City * * * at the request of the said police department of the city of New York, and its officers, identified the plaintiff herein as and being the said Raymor, hereinbefore referred to, and this defendant alleges that the plaintiff was thereupon arrested but not by this defendant, but by the police department of the city of New York.' And you say it again in paragraph thirtieth, and you swore to all this on the 7th day of April, 1905. To each answer is attached a Schedule A, the letter in which you apologize to Grinnell and his wife, and ask an opportunity to explain to them the exceedingly peculiar circumstances which led to their 'arrest' (changed by Mitchell to 'detention'). What did you want to apologize for, if you had not had them arrested? In your sworn testimony at the first trial, as appears by the printed appeal book on file in the county clerk's office, you made oath that you pointed Grinnell out to Kennedy, and that thereupon Kennedy laid his hand on his shoulder, and that you thereupon told Kennedy, your hired servant, to take him along, and later you swore that you went into the inclosure where the passengers were, and caused him (Grinnell) to be arrested. Say, Commodore, are you getting desperate? Do you want to have to go out in the community, after you have been licked to the tune of $12,500 by one jury, and $10,000 by another, that in order to escape, if you possibly can, a third verdict against you have resorted to perjury? Both answers can't be true, Commodore, yet you have sworn to both. In one you swear that you did cause Grinnell's arrest; in the other you swear that you did not have him arrested. Do you want it to get out in your patent suits that you are not to be believed under oath, or that you will swear to papers according to your convenience instead of according to the truth? I have very little idea that Grinnell will take the matter to a police

magistrate. He is too much of a gentleman; but what if the judge, who will try the case this week, should take the notion into his head to send the two answers to the district attorney. It would be amusing, wouldn't it, to have an indictment found against you in New York, where the crime is committed, by our grand jury, and then to have proceedings taken to extradite you from New Jersey? I tried to tell you all this in February, but you wouldn't listen to me. What you have done, you seem to have done deliberately. There is only one chance for you to get out. Will you be man enough to take it, and be quick about it; or will you continue to be led like a blind man, upon advice, which I still believe must be against your own good judgment, but which, just as surely as you live, will take you to Sing Sing.

"Sincerely yours,    Lewis Jarvis."

It was upon this letter that the indictment was found, accusing the defendant of the crime of blackmail in that he "did feloniously send and cause to be forwarded to and received by one Edward Weston, and make for the purpose that the same might be sent to the said Edward Weston, a certain letter and writing, threatening to accuse the said Edward Weston of the crime of perjury and to publish and connive at publishing a libel of and concerning the said Edward Weston accusing him of having then lately before committed the crime of perjury, and thereby exposing him to and imputing to him disgrace, which said letter and writing is as follows: [Setting it out in full]—he the said Thomas P. Wickes, otherwise called Lewis Jarvis, then and there well knowing the contents of the said letter and writing and with intent by means thereof to extort and gain money from the said Edward Weston, against the form of the statute in such case made and provided. * * * " For a second count, the indictment accused the defendant of the crime of knowingly sending said letter with intent thereby to cause annoyance to said Weston. The jury found the defendant guilty as charged in the indictment, and he was sentenced to imprisonment in the penitentiary for the term of one year.

Condensed, this case may be thus stated: An attorney at law, employed as counsel in an action for false arrest upon a fee contingent upon success after two trials and one appeal, under an assumed name, upon stationery engraved with and from a locked post office box hired under the assumed name, in the guise of friendship, with suggestions of perjury, certainly of ultimate defeat, continued unpleasant notoriety and increased expense, repeatedly urges the defendant against whom he is conducting the litigation to make a settlement—a settlement which will ensure him one-fourth of the amount paid. On the very eve of the third trial, he writes that some one (that "some one" being himself) has obtained from the county clerk's office a certified copy of each of the defendant's answers:

"Maybe they are to be laid before a police magistrate and an application made for a warrant for your arrest upon the charge of perjury. * * * Do you want to have it go out in the community * * * that in order to escape, if you possibly can, a third verdict against you, you have resorted to perjury? * * * what if the judge, who will try the case this week, should take the notion into his head to send the two answers to the district attorney. It would be amusing, wouldn't it, to have an indictment found against you in New York. * * * There is only one chance for you to get out; will you be man enough to take it, and be quick about; or will you continue to be led like a blind man, upon advice, which I still believe must be against your own good judgment, but which, just as surely as you live, will take you to Sing Sing."

The bare statement of those facts makes it clear that the jury were warranted in finding that the defendant, knowing the contents of the letter, which threatened to accuse Weston of the crime of perjury, sent it to him with intent by means thereof to extort or gain money.

The appellant claims that there was no proof of guilt, that the letters have no hidden meaning, that unless crime is written in them there is no crime. Carried to its logical conclusion, this is to assert that defendant must have written, "Unless you pay me a certain sum of money I will accuse you of the crime of perjury," or no offense was committed. That is not the law of this state. In People v. Thompson, 97 N. Y. 313, Judge Earl said:

"The statute cannot be evaded under the guise of friendship. No precise words are needed to convey a threat. It may be done by innuendo or suggestion. To ascertain whether a letter conveys a threat, all its language, together with the circumstances under which it was written, and the relations between the parties may be considered, and if it can be found that the purport and natural effect of the letter is to convey a threat, then the mere form of words is unimportant. * * * The crime may be committed by one who sends a letter conveying a threat of some other person to do the forbidden acts. * * * Taking the whole letter, the inference is quite strong, if not irresistible, that either he or some one else, had some intention of renewing the prosecution against the son by appearing before the grand jury. Unless the letters mean that they have no purpose whatever."

So, in the case at bar, if the letter does not mean that unless a settlement were quickly made before the third trial, some one who had obtained the certified copies of the answer would apply to a magistrate for a warrant for Weston's arrest for perjury, or that the judge might do it, and that if he did not so settle he would be sent to Sing Sing as surely as he lived, then the letter means nothing. If the defendant was not trying to obtain a settlement of the civil suit by practicing on the fears of Weston by innuendo, suggestion and threat of a prosecution for perjury, what was he trying to do? In People v. Gillian, 50 Hun, 35, 2 N. Y. Supp. 476, affirmed 115 N. Y. 643, 21 N. E. 1117, the indictment charged that the letters threatened to accuse the complainant of having had sexual intercourse with a woman not his wife. The letters were anonymous and made no such statement. After asking for a loan, the words were:

"You will not refuse me this loan, you know that you cannot afford to refuse me.

"P. S. Neither old John, nor any of the family knows anything about this: this is straight goods and your money will be returned in the fall with interest."

Mr. Justice Barker said:

"The rule undoubtedly is that a threat of the character mentioned in the statute must be made in the letter or writing delivered to the complainant, and if this is not made to the satisfaction of the jury the prosecution must fail. But as we understand the rule, parol proof may be introduced by the people for the purpose of showing that by the use of the language, figures and phrases employed by the writer he threatened to make the charge as set forth in the indictment, and that the person to whom it was addressed so understood its meaning. If such is not the rule, much of the wrong and mischief intended to be reached by the statute would escape punishment. * * * The threat, as made, need not contain a full description of the offense as charged in the indictment, it is sufficient if the language used in the

writing, in connection with what preceded and what follows between the parties imported a threat to charge the crime alleged and was so understood by the parties: Commonwealth v. Bacon, 135 Mass. 521; Commonwealth v. O'Connell, 12 Allen (Mass.) 451.  *  *  *  The surrounding circumstances may be such that the jury would readily believe that the purport and natural effect of the letter was to convey a threat of the nature and character set out in the indictment. That the letter was intended to convey a threat of some kind is manifest on the face of it and the nature and character of the same is evidently disclosed in the postscript."

In People v. Eichler, 75 Hun, 26, 26 N. Y. Supp. 998, appeal dismissed, 142 N. Y. 642, 37 N. E. 567, the defendant was an attorney. He wrote:

"Please call at my office at 7 o'clock this evening in reference to the Meyer matter, without fail, otherwise I will be obliged to proceed against you criminally."

The court said:          •

"We think that the threat 'to proceed against you criminally' is equivalent to a threat to accuse the person of a crime."

The appellant claims that "nowhere in these letters is there a demand for anything." It seems to me that there is a very forcible demand that the civil suit be settled and "quickly," with the alternative of Sing Sing "as surely as you live." Settlement meant 25 per cent. of the amount thereof to the defendant; a demand for one included the other. There was no demand in the Wightman Case. 104 N. Y. 598, 11 N. E. 135. The language was:

"Are you willing to make suitable provision for such liability and thereby avoid publicity, or will it be necessary to take legal steps in the matter?"

There was no "demand for anything" in the Eichler Case, supra. There was no demand in the Thompson Case, 97 N. Y. 313. So long as there is an intent by threat to extort or gain money, the mere form of words is of no consequence. The only possible purpose of these letters was to extort or gain money. "Nor is it needful to constitute the crime that the threat should inspire fear, or as claimed by the learned counsel for the defendant, that it should be calculated to produce terror." People v. Thompson, 97 N. Y. 313, 318. "The instruction that if the threats were maliciously made with intent thereby to extort the property from Lyon, it was immaterial whether they did or did not produce any effect upon the mind of Lyon, were correct." State v. Bruce, 24 Me. 71.

It is no defense that the crime threatened to be charged has been perpetrated, nor that the defendant had cause to believe it had been or did believe it. In the Eichler Case, 75 Hun, 26, 26 N. Y. Supp. 998, the defendant was the attorney of the father of a child upon whom it was claimed the complainant had perpetrated horrible crimes. Mr. Justice Follett said:

"The moral turpitude of threatening, for the purpose of obtaining money, to accuse a guilty person of the crime which he has committed, is as great as it is to threaten, for a like purpose, an innocent person of having committed a crime. The intent is the same in both cases, to acquire money without legal right by threatening a legal prosecution. But threatening a guilty person for such a purpose is a greater injury to the public that to threaten an innocent

one, for the reason that the object is likely to be attained, and the result is the concealment and compounding of felonies to the injury of the state. The fact that the defendant believed in the complainant's guilt is no defense, and not even a mitigating fact."

To the same effect, State v. Bruce, 24 Me. 71, decided in 1844:

"A person whose property has been stolen cannot claim the right to punish the thief himself without process of law, and to make him compensate him for the loss of his property, by maliciously threatening to accuse him of the offense, or to do an injury to his person or property with intent to extort property from him."

On the same point, Kessler v. State, 50 Ind. 229; Motsinger v. State, 123 Ind. 498, 24 N. E. 342; State v. Debolt, 104 Iowa, 105, 73 N. W. 499; Elliott v. State, 36 Ohio St. 318; People v. Choynski, 95 Cal. 640, 30 Pac. 791; Com. v. Buckley, 148 Mass. 27, 18 N. E. 577, 1 L. R A. 624.

In People v. Whittemore, 102 Mich. 519, 61 N. W. 13, as in the case at bar, an attorney was indicted for threatening to prosecute for perjury unless the complainant would deed the land in controversy in suit in which the complainant had been examined as a witness, to . spondent's client for a named consideration. Subsequently the respondent did make a complaint against the complainant for perjury and caused his arrest. The court said:

"The circuit court charged the jury in effect that if the threats were made with the wrongful intent charged and were made maliciously, the offense was complete whether Lucas was or was not guilty of the offense of perjury. The respondent complains of this holding and contends that if respondent, having an interest in the matter, believed that Lucas was guilty of perjury he had the right to threaten to prosecute Lucas unless he should place the title where it belonged. But we think the law is settled otherwise. 2 Wharton Crim. Law, §§ 60, 64; Rosc. Crim. Ev. 979; Rex v. Gardner, 1 Car. & P. 479; Regina v. Cracknell, 10 Cox, C. C. 408; Com. v. Buckley, 148 Mass. 27, 18 N. E. 577, 1 L. R. A. 624; Com. v. Coolidge, 128 Mass. 55; State v. Goodwin, 37 La. Ann. 713."

The appellant pleads the privilege of an attorney in attempting to collect a just debt. But "the law does not authorize the collection of just debts by the malicious threatening to accuse the debtor of a crime." Com. v. Coolidge, 128 Mass. 55; People v. Eichler, supra. "Lewis Jarvis" was not the attorney of Grinnell. Nor would it have altered the case if the defendant had signed his own name to the letters. The privilege of an attorney does not extend so far as to sanction such letters as are in evidence in this case to be written to a defendant to force the settlement of an unliquidated claim of the attorney's client, in which he has a monetary interest, by threats. The blackmail denounced by the statute was made out; knowledge, threat, and intent, were all sufficiently proved to warrant the verdict.

No errors to the prejudice of the defendant were committed upon the trial, and the judgment should be affirmed. All concur.