ness of their corporation for many purposes, and especially with reference to the burthens of taxation for public purposes." 10 Wend. 192.

The question, therefore, narrows itself down to this: Does the second element above named exist in this case in the relator's favor? No doubt, if, in the provisions of section 63 under consideration, the term "person" were used alone, it would have to be construed in its general sense as including a corporation; but the provision is found as a part of one single sentence, which reads as follows:

"School district taxes shall be apportioned by the trustees upon all real estate within the boundaries of the district which shall not be by law exempt from taxation, except as hereinafter provided, and such property shall be assessed to the person or persons, or corporation owning or possessing the same at the time such tax list shall be made out, but land lying in one body and occupied by the same person, either as owner or agent for the same principal, or as tenant under the same landlord, if assessed as one lot on the last assessment roll of the town after revision by the assessors, shall, though situated partly in two or more school districts, be taxable in that one of them in which such occupant resides."

It thus appears that this sentence consists of two clauses separated merely by a comma, and that in the first clause the terms used are "the person or persons, or corporation owning," etc. It would seem, therefore, that the same mind in using in the latter clause of the same sentence the word "person" alone could not have intended that term there to include a corporation as well as a natural individual. If such was the intent, such usage was loose and inexact. It is apparent from the decision of our Appellate Division in the case of People ex rel. Bourne v. Howell, above cited, that no equity or convenience of the owner of such tract, real or supposed, can suffice to bring his case within the statutory exemption from the general rule. Here in this case, however, it seems to me that as it does not appear that children residing upon this tract are schooled in the school or schools maintained by district No. 7, and therefore at its expense, there is no equity in favor of district No. 7, and I cannot perceive how the practice of assessing in both districts which prevailed apparently without difficulty from 1900 to 1906 can be of any substantial inconvenience to the relator.

I conclude, therefore, that I am warranted in deciding here according to what appear to me to be the natural equities of the case, and therefore decide that the assessment here under review was lawfully made. The writ of certiorari will therefore be dismissed.

---

### In re HART.

(Supreme Court, Appellate Division, First Department. April 8, 1909.)

1. ATTORNEY AND CLIENT (§ 39*)—DISBARMENT—GROUNDS—PROFESSIONAL MISCONDUCT.

Respondent was employed to bring a civil action against C. for assault upon a girl, and had the girl's sister appointed guardian ad litem to maintain the action, but did not then attempt to serve a summons, which he had prepared. Several days thereafter respondent procured from the magistrate's court a summons citing C. to appear to answer a charge of crim-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

inal assault; but the evidence showed that he had no intention of prosecuting C., but the summons was merely served to force a settlement of the civil action contemplated, knowing that C. desired to avoid notoriety. After several consultations with C.'s attorney, a settlement was effected by which C. paid over $2,500 upon respondent's agreement that the matter would be dropped. Respondent knowingly permitted the compromise money to be received by the guardian ad litem without her giving the security required by Code Civ. Proc. § 474, nor was the court's approval secured to an agreement by which the guardian was to give respondent half the amount recovered for prosecuting the civil action. *Held*, that as respondent was guilty of blackmail and compounding a crime, and in view of his action in permitting the guardian ad litem to take the compromise money without giving security, his conduct required that he be disbarred, and the fact that he candidly admitted the culpatory facts did not mitigate his offense.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 52; Dec. Dig. § 39.*]

2. CRIMINAL LAW (§ 216*)—SUMMONS—NATURE—MAGISTRATE'S SUMMONS.

The service of a summons issued out of a magistrate's court, citing another to appear to answer a criminal charge, is not the commencement of a criminal prosecution, but a mere notice to the person served that a charge is to be made against him.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 435; Dec. Dig. § 216.*]

3. ATTORNEY AND CLIENT (§ 53*)—DISBARMENT PROCEEDINGS—EVIDENCE—SUFFICIENCY.

In disbarment proceedings for threatening a criminal prosecution in order to compel a compromise of a threatened civil action, evidence *held* to show that respondent served the proposed defendant in the civil action with a magistrate's summons merely to force a settlement of the contemplated civil action, without any intention of prosecuting the person served.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 75; Dec. Dig. § 53.*]

4. THREATS (§ 1*) — ELEMENTS OF OFFENSE—THREATENING CRIMINAL PROSECUTION.

Where an attorney, who was engaged to prosecute a civil action for an assault upon a girl, had a summons issued out of a magistrate's court, citing the proposed defendant in the civil action to appear to answer a charge of criminal assault, merely to force a settlement of the civil action and without any intention of prosecuting him, he was guilty of blackmail, whether the summons operated as the beginning of a prosecution or as mere notice of intention to do so, and whether the person accused was guilty or not as a claim cannot be collected by threatening to accuse the debtor of crime.

[Ed. Note.—For other cases, see Threats, Cent. Dig. § 1; Dec. Dig. § 1.*]

5. INFANTS (§ 84*)—ACTIONS—GUARDIAN AD LITEM—DUTIES.

A guardian ad litem cannot make any contract which would dispose of, or create a lien upon, the infant's cause of action or the proceeds thereof, without the court's approval, so that an agreement by a guardian ad litem, without the court's approval, to pay the attorney prosecuting the action a percentage of the recovery, was illegal.

[Ed. Note.—For other cases, see Infants, Cent. Dig. § 239; Dec. Dig. § 84.*]

6. ATTORNEY AND CLIENT (§ 32*)—DUTIES—PROMOTION OF JUSTICE.

If an attorney had knowledge which in his opinion justified a prosecution for criminal assault, it was his duty to notify the prosecuting officer, so that the charge could be investigated.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 46; Dec. Dig. § 32.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. COMPOUNDING FELONY (§ 3*)—AGREEMENT TO COMPOUND.

Under Pen. Code, § 125, making one who takes money upon an agreement to compound or conceal a crime, or to discontinue a prosecution thereof, guilty of a felony if the agreement relates to a felony, or of a misdemeanor if it relates to a misdemeanor, except where a compromise is allowed by law; Code Cr. Proc. § 663, permitting such compromise only when a defendant is brought before a magistrate or is held to answer for certain misdemeanors, and section 666, forbidding any compromise, except as provided in sections 663 and 664, an attorney who had procured an affidavit from the girl upon whom a criminal assault was alleged to have been committed, and had obtained a summons charging another to appear to answer for the crime, by thereafter agreeing to drop the matter and say nothing more of it upon payment to him of a sum, was guilty of compounding a crime.

[Ed. Note.—For other cases, see Compounding Felony, Cent. Dig. § 2; Dec. Dig. § 3.*]

In the matter of disbarment proceedings against Joseph D. Hart, an attorney. Judgment of disbarment.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, LAUGHLIN, and SCOTT, JJ.

SCOTT, J. The respondent, an attorney of this court, was charged upon the complaint of a client, with improper and unprofessional conduct. The matter was sent to a referee, who found and reported that these charges were not sustained by the evidence. The referee, however, found, and so reported, that it had appeared from the evidence taken before him that the respondent, having brought an action for one Evelyn Reed, as guardian ad litem for her sister, Charlotte Reed, effected a settlement of said action without having obtained the permission of the court, and that, having instituted a civil action for damages for an alleged criminal assault, he simultaneously for the same cause commenced a criminal proceeding, which he allowed to lapse upon the opening of negotiations for a settlement upon which he was to receive a contingent fee. As the matter last mentioned was not embraced in the original charges, the Association of the Bar of the City of New York prepared and presented supplementary charges, which have been submitted to the court upon the evidence already taken before the referee; neither the petitioner nor the respondent availing of the opportunity, which was afforded, to submit further evidence. The supplemental charges are:

(a) That on or about the 16th day of April, 1907, in the city and county of New York, the said respondent, knowing the contents of a writing which threatened to accuse one W. N. Crane of a criminal assault, delivered the same to said Crane with intent and by means thereof to extort or gain money.

(b) That on or about April 16, 1907, the respondent took money upon the agreement or understanding to discontinue the prosecution of a criminal proceeding for assault theretofore instituted in the Jefferson Market magistrate's court against the said W. N. Crane.

There is no dispute as to the facts, which were in large part testified to by the respondent himself. The respondent has been practicing as an attorney in the city of New York for 13 or 14 years. On the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2d or 3d of April, 1907, he was visited in his office by one Evelyn Reed, whom he had not previously known. She informed him that during her absence from her apartment her younger sister, Charlotte, an infant, had been visited by a man who had attempted to outrage her. Respondent asked for a retainer, which Miss Reed declared herself unable to pay, whereupon it was agreed between them that respondent should receive 50 per cent. of any recovery in a civil action. Respondent does not testify that anything was said, at that time, about a criminal proceeding. Respondent visited the apartment house where the Reeds resided and took the statements in writing of Charlotte Reed and of certain employés of the house. On April 5, 1907, respondent prepared the necessary petition and consent, and obtained from a justice of the Supreme Court an order appointing Evelyn Reed, guardian ad litem for Charlotte Reed, for the purpose of bringing an action against W. N. Crane for assault, and on the same day prepared a summons in the civil action against Crane. No attempt seems to have been made at this time, or for ten days afterwards, to serve the summons on Crane, and thus to commence the civil action. On about April 8th or 9th (the date is left uncertain) the respondent procured from the Jefferson Market city magistrate's court, and caused to be served on Crane, what is known as a summons, citing Crane to appear on April 11th to answer to a charge of assault on Charlotte Reed. Such a summons is not a legal process which the person summoned is bound to obey, but is in effect nothing more than a notification that at the time and place mentioned therein a charge will be made. It is not the commencement of a criminal proceeding, does not, apparently, require that an information or complaint shall be laid before the magistrate before it is issued, and it does not appear in the present case that such an information or complaint was laid before the magistrate. On the return day mentioned in the summons Crane did not appear, but an attorney named W. J. Bolger, who had been retained by him, did appear, and inquired of the respondent what the charge against Crane was. Respondent told him, whereupon Bolger denounced the proceeding as a blackmailing one, and said that he did not propose to have his client come to court in response to the summons and have the matter made public knowledge; that if respondent wanted Crane in the magistrate's court he would have to arrest him. Thereupon the respondent had the return day of the summons adjourned to April 16th.

Nothing further was done until April 15th, when respondent called Bolger up on the telephone and had a conversation which resulted in Bolger's going to respondent's office. Respondent showed to Bolger the statement of Charlotte Reed, and the order appointing Evelyn Reed her guardian ad litem. Bolger then said that, if it was proposed to bring a civil action, he would accept service for his client, and give a notice of appearance, as he did not want any more papers served on his client, or any one sent to his house. Thereupon the summons in the civil action was served on Bolger, and he gave notice of appearance for Crane. A conversation then ensued concerning the payment of a sum of money in settlement, but no conclusion was then arrived at, as the parties were too far apart; Bolger offering $500, and respond-

ent demanding $25,000. On the following morning there appeared, most opportunely, in a daily newspaper, a long and circumstantial account of the alleged assault on Charlotte Reed, in which the assailant was not named, although the description given tallied well with that of Crane. It does not appear that respondent caused this article to be printed. He says that a reporter called upon him and said that he had heard something about the story, and that he (respondent) refused to say anything about it, but advised the reporter to go to the apartment house in which the Reeds lived to get the rest of the story. It appeared that the publication of this article greatly disturbed and alarmed Crane. On the same day, being the day to which the return of the summons had been adjourned, the respondent and Bolger met in the magistrate's court. Neither the Reeds nor Crane were present. The discussion as to a settlement was renewed, and Bolger said that his client was much wrought up over the newspaper article, and that if anything more appeared he should take the matter to the district attorney.

The negotiations for a settlement went on during the day; Bolger protesting all the time that what he wanted was to avoid notoriety, and respondent offering to guarantee that, if a settlement was effected, not another word would appear. Finally on the same day a settlement was effected by the payment by Bolger, on behalf of Crane, of $2,000, on receipt of which Evelyn Reed, as guardian, executed a general release. Later Bolger paid respondent a counsel fee of $500, and no further action was taken in the magistrate's court. Respondent paid Evelyn Reed $1,250, retaining a like sum for himself. No order permitting the guardian to compromise the action was obtained, and no security was given by the guardian, as required by section 474 of the Code of Civil Procedure and rule 51 of the General Rules of Practice. Respondent admits his familiarity with the statutory requirements in this regard.

It is argued on behalf of respondent that the taking out of a summons in a magistrate's court is not the commencement of a criminal prosecution, and with this contention we are disposed to agree. The issuance and service of such a summons amounts to nothing more than an intimation that a charge of criminality is to be made against the person to whom the summons is directed. There is no evidence that respondent was retained to institute a criminal prosecution. His own evidence as to his retainer indicated very plainly that he was employed to demand and collect pecuniary damages (of which he was to have half), and these could not properly or legally be collected by means of a criminal proceeding. The only evidence as to any suggestion to the Reeds of a criminal prosecution is that, when something was said on the subject to Evelyn Reed, she repudiated the idea, because it would involve the interposition of the Gerry Society. Nor is there anything to show that Hart ever seriously considered the institution of a criminal prosecution.

It is urged on his behalf that, having become cognizant of the commission of a crime by Crane, it was his right, and perhaps his duty, to take steps looking to his prosecution criminally. This may be admit-

ted, but he never did so. It does not appear that he ever laid before the magistrate or the district attorney the facts upon which such a prosecution could have been based, even when challenged so to do by Crane's attorney. The reason is fairly obvious. If he had actually initiated a criminal prosecution by laying the facts before the proper officer, he would have lost control of the prosecution, and could not have agreed to drop it upon a settlement of the civil action for damages. The whole evidence tends to show that the impelling cause which led Crane to settle was the fear of publicity. He was an old man, accused of a shameful crime, and not unnaturally shrank from notoriety. It is equally evident that respondent appreciated how potent a factor this fear of publicity would be in inducing Crane to settle, and that the settlement was finally made especially with a view to escaping notoriety. Although everything was ready to begin the civil action on April 5th, no attempt was made to do so until the 15th. When Bolger declared that Crane would not appear in the magistrate's court in response to a summons, the respondent did not apply for a warrant, but adjourned the return day of the summons. When Crane showed no disposition to move in the matter, it was respondent who called up Bolger and showed him the statement of Charlotte Reed, and, as respondent himself testifies, the criminal proceeding was dropped when Bolger began to show a disposition to make a cash settlement. Finally, as part consideration and inducement for a settlement, respondent undertook to guarantee that the matter should be given no further publicity.

The service of the summons issued out of the magistrate's court, while not the actual commencement of a criminal prosecution, amounted distinctly to a threat of such a prosecution. It was at least as effective, if not more so, than a letter threatening a prosecution would have been, and from the whole evidence we cannot escape the conviction that the service of the summons from the magistrate's court was intended merely as a threat of a criminal prosecution, made in order to force a settlement of the civil action which was contemplated and prepared for before the criminal summons was taken out, and that the respondent never actually intended to prosecute Crane criminally. If this be so, there can be no doubt that the respondent acted illegally, improperly, and unprofessionally. People v. Eichler, 75 Hun, 26, 26 N. Y. Supp. 998, appeal dismissed 142 N. Y. 642, 37 N. E. 567, was a case much like the present. The defendant, an attorney, had been retained to prosecute a man for damages for assault upon a young girl. He wrote a letter to the accused in which he said:

"Please call at my office at 7 o'clock this evening in reference to the Mayer matter, without fail; otherwise, I will be obliged to proceed against you criminally."

He was convicted of an attempt at blackmail, and his conviction was affirmed by the General Term in this Department. In People v. Wickes, 112 App. Div. 39, 98 N. Y. Supp. 163, this court has recently had occasion to review a similar conviction, where the offense consisted in sending, not a threatening letter, but an apparently friendly one, suggesting a possible prosecution for the crime of perjury; the pur-

pose being to induce the addressee to forego his appeal from a civil judgment against him. Again the conviction was affirmed.

The respondent justifies himself in threatening a criminal prosecution on the ground that he really believed that a crime had been committed. The same plea was interposed by the defendant in People v. Eichler, supra. The court said upon this subject:

"The moral turpitude of threatening, for the purpose of obtaining money, to accuse a guilty person of the crime which has been committed, is as great as to threaten, for a like offense, an innocent person of having committed a crime. The intent is the same in both cases—to acquire money without legal right by threatening a criminal prosecution. But threatening a guilty person for such a purpose is a greater injury to the public than to threaten an innocent one, for the result is more likely to be attained, and the result is the concealment and compounding of felonies to the injury of the state. The fact that the defendant believed in the complainant's guilt is no defense, and is not even a mitigating fact."

These words are quoted with approval in People v. Wickes, supra, and supported by numerous authorities from other jurisdictions. It is true that it was respondent's privilege as an attorney to sue Crane for damages, and it may be that the claim therefor was well founded; but—

"the law does not authorize the collection of just debts by the malicious threatening to accuse the debtor of a crime." People v. Wickes, supra; People v. Eichler, supra; Commonwealth v. Coolidge, 128 Mass. 55.

If it be considered that the issue and service of the summons issued out of the magistrate's court was in effect the commencement of a criminal prosecution, the respondent is placed in no better light, because then he was guilty, under the second supplementary charge, of taking money upon the agreement and undertaking to discontinue a prosecution for a crime. It may be claimed for the respondent that the frankness with which he admitted all the facts upon which the charge against him is based indicated that he did not understand that he was doing an unlawful thing. If so, not only does it not mitigate his offense, but most clearly demonstrates his unfitness to fill the honorable office of an attorney of this court.

Nor may we pass by in silence his act in permitting Evelyn Reed to accept a sum of money in settlement of the action without complying with the plain requirements of the law as to giving security. That alone would call for severe censure, if not for disciplinary action. Section 474 of the Code of Civil Procedure explicitly forbids a guardian ad litem, who is not also a general guardian—

"to receive money or property of the infant, other than costs and expenses allowed to the guardian by the court until he has given sufficient security approved by a judge of the court, or a county judge, to account for and apply the same under the direction of the court."

Respondent admits that he knew of this section, and yet he deliberately permitted his client to violate it. Such a plain disobedience of law cannot be overlooked. We are constrained to hold that the respondent has been clearly shown to be an unfit person to remain a member of the bar.

The motion is therefore granted, and the respondent disbarred. All concur.

INGRAHAM, J. I concur with Mr. Justice SCOTT in his opinion; but the character of the charges made against this respondent and the frequency with which attorneys have used the process of the criminal courts, or made threats of criminal proceeding, to extort settlements of alleged claims for damages, justifies some additional comment in disposing of this application.

Accepting the statement of the respondent, he was consulted by the sister of an infant in relation to an assault alleged to have been made upon her, and examined the facts in relation to the assault by interviewing the infant and others who had knowledge of the occurrence. The respondent then prepared a petition by the infant to procure the appointment of a guardian ad litem. That petition alleges that the petitioner was 15 years of age, that both her parents were dead, and that she resided with her sister in the city of New York; that the petitioner desired to bring an action against one Crane for an assault and battery committed on her by the said Crane on the 30th of March, 1907, while the petitioner was alone in her apartment, and asked that her sister, Evelyn Reed, be appointed her guardian ad litem for the purpose of prosecuting said action; and that petition, on the 5th of April, 1907, by an order of the Special Term, the said Evelyn Reed was appointed guardian ad litem of Charlotte Reed, an infant, and was authorized to prosecute for her, as such guardian ad litem, the action mentioned in the petition. The guardian was required to give no bond. This application was made under sections 469 and 470 of the Code. Section 474 of the Code of Civil Procedure provides that:

"Except in a case where it is otherwise specially prescribed by law, a guardian, appointed for an infant, as prescribed in this article, shall not be permitted to receive money or property of the infant, other than costs and expenses allowed to the guardian by the court, until he has given sufficient security, approved by a judge of the court, or a county judge, to account for and apply the same, under the direction of the court."

Assuming that the infant had a cause of action to recover the damages sustained by her for a personal injury, that cause of action was the property of the infant, and the respondent was called upon to protect the interest of the infant, and was charged with obedience to the law enacted to protect her and her property. The guardian had no power to make any contract or agreement which would dispose of or create a lien upon the infant's cause of action, or any money or property realized therefrom, without the approval of the court. The respondent, however, made a bargain with the guardian which disposed of 50 per cent. of the infant's cause of action, and which, if valid, would have made him directly interested in the proceeds of the infant's cause of action, realized through the legal proceedings which were contemplated. It seems to me that the making of such an agreement, an agreement in direct violation of the law, is of itself serious professional misconduct. The fact that it was not binding in any way upon the infant does not mitigate the seriousness of the offense. It was an attempt of an attorney of this court, in violation of his duty and in violation of law, to possess himself of one-half of an infant's cause of action by virtue of an agreement made with a person appointed to conduct a litigation, and who was prohibited from receiving the pro-

ceeds of such litigation, or any property of the infant, except upon giving a bond approved by a judge; and this unauthorized and improper arrangement, made by an attorney to dispose of the infant's property, is to be considered, when we come to examine his subsequent actions.

Having obtained an order appointing the infant's sister guardian ad litem on the 5th of April, 1907, the orderly course of proceeding would have been to commence an action on behalf of the infant against the person who it was claimed had injured her to enforce the legal liability which it must be assumed the respondent considered existed; but, instead of commencing such an action, he resorted to a police magistrate and obtained a summons directed to the person against whom the infant's claim existed to appear before the magistrate to answer a criminal charge. The attorney had in his possession an affidavit of the infant detailing the circumstances of the alleged assault. That affidavit does not appear to have been submitted to the magistrate. At any rate no warrant was obtained; but this summons from the magistrate's court was served upon the person against whom the charge was made. If the attorney had written to the person against whom the charge was made a letter threatening him with criminal prosecution unless he settled the infant's claim, he would have been guilty of an attempt to blackmail. People v. Eichler, 75 Hun, 26, 26 N. Y. Supp. 998; People v. Wickes, 112 App. Div. 39, 98 N. Y. Supp. 163. But obtaining and serving a summons from the magistrate, which required the person to appear before the magistrate and to answer a criminal charge then to be made, whether the summons had any legal efficacy or not, was much more terrifying and oppressive than the mere writing of a letter.

It is not claimed that the respondent had any authority from either the infant or her guardian ad litem to institute this criminal proceeding, or to threaten to institute it. He did it of his own motion, to accomplish his own purpose, and evidently to prepare for the claim subsequently to be made for damages against the person charged. When this summons was returnable the person charged with the crime did not appear; but his attorney did, and testified that he characterized the proceeding as blackmail, which characterization the respondent does not seem in any way to have resented. The respondent was notified that the person charged would not appear and answer the summons. After this statement the respondent did not obtain a warrant. The public prosecutor was not notified that a crime had been committed and requested to prosecute, nor was the magistrate notified of the facts; but secrecy was still maintained, leaving the fact that a criminal charge could be prosecuted to rankle in the mind of the victim and produce a proper mental condition to make a subsequent claim for money more serious.

Here it is proper to remark that the duty of the respondent, an officer of the court, was plain. He had knowledge which it must be assumed in his opinion justified the prosecution for a serious offense. It was clearly his duty under these circumstances to notify the prosecuting officer or the police magistrate charged with the duty of prosecuting and inquiring into such a charge, and if he had performed that

duty and then dropped the matter of the criminal charges a different question would have been presented. Nothing, however, of that kind was done. He waited quietly until the 15th of April, the day before the day to which the return of the summons to appear before the magistrate had been adjourned, and then called up the attorney for the person against whom the charge was made to see if a settlement could be arrived at. No action had been commenced, although a guardian ad litem had been appointed for 10 days. In consequence of this communication the attorney for the person against whom the charge had been made called upon the respondent and then commenced negotiations for the payment to the respondent of a sum of money to settle this infant's claim. Twenty-five thousand dollars was demanded by the respondent, and five hundred dollars was offered.

There had quite opportunely appeared in the New York Herald an article having reference to this charge, which was of the kind calculated to injure the person against whom the charge was made. The respondent disclaims having instigated this article, but he testified that, when a reporter of the Herald called on him in relation to the matter, he referred the reporter to the apartment house in which the infant resided and told him to get his information there; and then, after the article was published, at the interview between the respondent and the attorney for the person against whom the charge was made, the respondent called the attorney's attention to this article. If the respondent did not instigate the article, he certainly used it in carrying out his scheme. The respondent was then offered $1,000 to settle, which he refused, claiming $10,000. At this interview, at which the $1,000 was offered, the attorney for the person against whom the charge was made stated that "the only reason we considered settlement at all was the desire to avoid unpleasant notoriety, and that was our main purpose in trying to effect a settlement"; that the respondent "must in some way guarantee me that he would stop all publicity and protect the reputation" of the person against whom the charge was made; that the attorney did not care anything about releases or stipulations, but wanted a guarantee that there would be no further notoriety, and to that the respondent said that he would guarantee that there would not be another word about it. The attorney then asked the respondent if his clients would not go away, to avoid all publicity and newspaper men, in case the matter was settled, and he said that they would go out of town.

After this conversation the parties separated, but subsequently an offer of $2,000 was made to settle, and the respondent finally accepted that sum. The respondent then said that he would have a release from the infant or her guardian, and one was drawn up and executed by them; the sum paid in settlement being stated in the release at $2,000. Subsequently the respondent demanded $500 more for his fee, which demand was acquiesced in, and $2,500 in all was paid to the respondent. At the first interview a summons in a civil action was prepared demanding $25,000 damages, the service of which the attorney admitted, and a notice of appearance for his client as defendant in the action was served, but no complaint was ever served. No legal serv-

ices were performed, except obtaining the order appointing the guardian ad litem and serving this summons.

Assuming that this person charged had been guilty of assaulting a young girl, 15 years of age, alone in her apartment, and the respondent had threatened to make a criminal charge against the person charged with being guilty of such an assault, there would be presented a case in which the offense of compounding a crime is proved. Section 125 of the Penal Code provides that a person who takes money, or other property, gratuity, or reward, or an engagement or promise therefor, upon an agreement or understanding, express or implied, to compound or conceal a crime, or a violation of statute, or to abstain from, discontinue, or delay a prosecution therefor, or to withhold any evidence thereof, except in a case where a compromise is allowed by law, is guilty of a felony where the agreement or understanding relates to a felony, or of a misdemeanor where the agreement or understanding relates to a misdemeanor, or to a violation of a statute for which a pecuniary penalty or forfeiture is prescribed. A compromise, of course, is allowed by sections 663 and 664, Code Cr. Proc. By section 663 such compromise can only be made when a defendant is brought before a magistrate or is held to answer on a charge of a misdemeanor for which the person injured by the act constituting the crime has a remedy by civil action; and section 666 specifically provides that no crime can be compromised, nor can any proceedings for the prosecution thereof be stayed, except as provided in sections 663 and 664. This respondent claimed to have had knowledge that a crime had been committed. He had an affidavit of the person upon whom the crime was alleged to have been committed, and had obtained a summons requiring the person charged to appear before a magistrate to answer for the crime. He then agreed that, if a sum of money was paid to him, one-half of which he claimed and actually retained, he would guarantee that there would not be another word about it. The respondent, having received information that the settlement was made and the money was paid to suppress notoriety as to the charge, and having made this guaranty, received the sum of $2,500, one-half of which he claimed the right to appropriate and did appropriate to his own use.

We have here, I think, two crimes by this respondent, of which he is guilty upon his own testimony: First, the crime of blackmail; and, second, that of compounding a crime. We have, then, a third offense. He had received on the part of this infant the sum of $2,500, of which he claimed to be entitled to one-half. In the hands of the respondent this money was the property of the infant, just as much as any property that belonged to her; and section 774 of the Code of Civil Procedure provides that that money should not be paid to the guardian ad litem until she had given a bond. Upon an application made to the Supreme Court for the approval of such a bond, the fact that $2,500 had been paid to the attorney in settlement of the infant's claim would have been disclosed to the court, and then it would have been the duty of the court to determine the amount of compensation to which the attorney was entitled and fix the bond that the guardian ad

litem was required to give. That, of course, would have defeated the respondent's object, for no court would have awarded anything like the sum of $1,250 for obtaining the appointment of a guardian ad litem and serving a summons; and so the respondent, to enable him to appropriate to his own use the money of this infant, without legal justification, paid over to the guardian ad litem, first $1,000, and then, after this proceeding was instituted, $250, and appropriated the other $1,250 of the infant's money to his own use.

The infant or her guardian ad litem having discovered that the defendant had got $2,500, and had only paid over $1,000, seems to have thought that she could obtain something more from the defendant, and made a demand upon him for $1,250 in addition to the $1,000 that she had received, an amount which would have allowed the respondent $250 for his services, which, except for the risk he ran of being amenable to the criminal law and a disbarment, would have been ample compensation for his services. This being refused, a complaint was then made to the Grievance Committee of the Bar Association against the respondent. The statement of the guardian ad litem was taken by the committee, and the proceeding was adjourned to a subsequent day, at which the guardian ad litem was to be present and the respondent was to cross-examine her; but before the adjourned meeting was had it appeared that the respondent paid to the guardian ad litem $250, and then she disappeared, and the respondent refused to make any statement to the committee, because he had not had an opportunity of cross-examining the guardian ad litem, and upon the hearing before the referee in this proceeding it was impossible to subpœna her as a witness.

There have been two coincidences in this case that have very much aided the respondent: First, the most opportune publication in the New York Herald, just when the attack was to be made for a settlement; and, second, the disappearance of the guardian ad litem, who had made the charge before the Bar Association, and whose testimony before the referee would have been quite important. The methods of the respondent in practicing what we have been taught to believe was an honorable and learned profession, are such that, if the profession is to be respected by any one, he must no longer be a member of it. All concur.