In the Matter of the Application of Samuel M. Stein for Reinstatement to the Bar.

First Department, January 15, 1937.

*Herman L. Falk* of counsel [*William M. Cubert*, attorney], for the motion.

*Einar Chrystie, of counsel for the Association of the Bar of the City of New York,* opposed.

MARTIN, P. J. The applicant, Samuel M. Stein, was indicted on March 13, 1935, jointly with one Michael J. Griffin and one Belle Ferguson, also known as Belle O'Brien, and convicted in the County Court of Nassau county of a felony (attempted grand larceny and conspiracy), and sentenced to imprisonment in Sing Sing Prison for from two to four years. By reason of said conviction he was disbarred by order of this court. (*Matter of Stein*, 244 App. Div. 540.) On July 3, 1935, his conviction was reversed by the Appellate Division, Second Department (*People* v. *Stein*, 245 App. Div. 838), and a new trial ordered on authority of *People* v. *Ferguson* (245 App. Div. 837) upon the ground of error in the charge and because the guilt of the defendant was not established beyond a reasonable doubt.

On September 10, 1935, the district attorney of Nassau county, stating that all the evidence known to exist had been presented to the court upon the trial, moved to dismiss the indictments, and the motion was granted. On October 4, 1935, Samuel M. Stein moved this court, pursuant to the provisions of subdivision 4 of section 88 of the Judiciary Law, that the order of disbarment be vacated and the applicant reinstated as an attorney and counselor at law. Subdivision 4 of section 88 provides that upon a reversal of the conviction the Appellate Division shall have power to vacate or modify the order of disbarment. Such reversal does not in itself give a right to reinstatement. It merely opens the way to an application for reinstatement upon which the petitioner seeking reinstatement has the burden of satisfying the court of his general fitness to be restored to so honorable a profession. Such an inquiry is not limited to the question of his guilt of the charge upon which he was convicted. As was said in *Matter of Kaufmann* (245 N. Y. 423): " Even innocence of the crime will not suffice if there has been a failure to live up to the standards of morality and honor."

The matter was referred to an official referee to take testimony with respect to the facts and circumstances resulting in the conviction and report the same with his opinion whether the applicant should be reinstated. The referee's report and the evidence upon which it is based has convinced this court that the application for reinstatement should be denied.

Our conclusion is based on the following facts: Belle Ferguson, also known as Belle O'Brien, in about the year 1912 was the wife of a man named O'Brien. O'Brien claimed that one Chapal had

alienated the affections of his wife, and commenced an action against him on that ground. The action was settled by payment to O'Brien of the sum of $25,000. The O'Briens were thereafter divorced, and although Chapal was a married man living with his family, Mrs. O'Brien was supported by him as his mistress, receiving from him in the neighborhood of $30,000 annually. In 1927 these relations ceased, and Mrs. O'Brien made a demand upon Chapal for a settlement, which was refused.

Chapal died in July, 1928, leaving him surviving his widow, a daughter and a stepson.

After the death of Chapal, Belle O'Brien employed Mr. Joseph M. Reilly as her attorney in fact to take steps to collect money which she claimed was due her from the Chapal estate. Mr. Reilly retained an attorney named Michael J. Griffin. In April, 1928, Samuel M. Stein, the applicant herein, entered the picture as one of the attorneys for Belle O'Brien, and with knowledge of the relations that had existed between the deceased and his client, prepared or assisted Griffin in the preparation of a claim for $500,000 against Chapal's estate and personally filed it with the attorneys representing the executors. The claim recites: " The basis of said claim consists of certain promises made by the decedent to the claimant during the lifetime of said decedent and certain obligations of a matrimonial nature, which will be presented when proof is requested by this Court." The proof of claim was dictated by Griffin in the presence of Stein and was indorsed with the names of Michael J. Griffin and Samuel M. Stein, the applicant, as " attorneys for the claimant."

The applicant admitted that he had had no surrogate's practice at the time he entered the case, and that the only reason he was retained was the belief that, because of his acquaintance with an executor of the estate, he would be able to help Mr. Griffin obtain a settlement. He never sought to ascertain from his client upon what consideration she based her claim for $500,000. In fact he never even met her until some nine months after the claim was filed. A demand for a bill of particulars of the claim was never complied with. The applicant's testimony shows that he knew of the former illicit relations between his client and Mr. Chapal, which relations he also knew were known to the family of Mr. Chapal, and it is apparent that the words " certain obligations of a matrimonial nature " were used as a thinly veiled threat to publish the facts unless there was a settlement of the claim.

The applicant and Mr. Griffin endeavored to secure a settlement by threatening publicity. The applicant testified that he was offered $350,000 to settle the case, which offer was accepted, but

was subsequently repudiated by the executors. The fact is that the claim had been definitely rejected by the executors long prior to the alleged agreement of settlement and the latter is a pure fabrication by the applicant. The blackmailing attempt failed because the family did not fear publicity, the relationship being generally known.

The record also discloses an attempt to blackmail one of the executors. It appears that a paper purporting to be a copy of an order dated March 14, 1931, alleged to have been made by Hon. LEONE D. HOWELL, surrogate of Nassau county, was prepared by Griffin. No such order had ever in fact been made. Whether it was knowingly fabricated is immaterial. It served as an excuse for the applicant, Griffin and one Donlon to call upon the surrogate. What took place at such interview, as testified to by the surrogate, is interesting. He testified: " During the entire conversation with me, there was no one person that completed anything. Mr. Griffin might start a statement, Mr. Stein might finish it, or the other man might finish it, so that no one of them told me a completed story, not at any time. If some one made a statement, one of the others would chime in, modifying it or adding to it, or taking away. So that the conversation was with all three, and it is utterly impossible for me to say that any one was responsible for the entire conversation. Mr. Griffin was the man who talked with me about this order, and I questioned him about it, and he produced this paper." The surrogate continued his testimony that when Mr. Griffin handed him the order he looked at it and said: " Well, that is, there is nothing to it, for several reasons. And he wanted to know why, and the first reason, I said, ' I have been here many years and I have never yet signed an order " L. D. H." It is only within the last year or so there has been a clarity in the law giving a surrogate the right to sign by initials, but I have never taken advantage of it, and I have never signed an order in my life " L. D. H." ' He wanted to know why I was sure, and I said, ' I know that is a general rule, and I know it can't be so, and furthermore, I don't know why I should ever sign an order of that character anyway. They can sell any securities they wanted to sell. They are executors, I am not.' And he took the order back. I handed it back to him, and there wasn't a great deal more said about the order at the time that I declared it to be non-existent, that I never signed any such thing as that. That is as far as the order went."

The applicant admitted that he made and delivered a statement to Mr. Reilly, signed by himself and Mr. Griffin, falsely stating that the status of the matter was that $500,000 was being held

in escrow by the executors of the estate of Mr. Chapal pending settlement of the claim of Mrs. O'Brien and that an appointment was then pending with the other executor. Admittedly the only basis for said statement was the "intention" to try to get an appointment to discuss the claim. This gives an insight into, and characterizes the entire testimony of the applicant in this proceeding. But one conclusion can be reached upon this record. It is summed up by the referee as follows:

"In my opinion the evidence establishes that he was a party to a conspiracy and attempted blackmail. That he was guilty of condemnable professional misconduct in entering into a conspiracy as an attorney to present to a wealthy estate a meretricious claim in behalf of his client for half a million dollars of which his share was agreed upon to be from twelve to fifteen percent of the recovery. The claim was in behalf of a woman of bad repute and known by him to have had meretricious relations with the man against whose estate the claim was to be made. That he prepared or assisted in the preparation of a statement of the claim which he afterwards filed with the attorneys for the executors in which he inserted or consented to the insertion of the words that the alleged claim was partly based upon 'certain obligations of a matrimonial nature.' That by the use of that phrase it was intended by the applicant by innuendo and insinuation to give notice of the scandalous nature of the claim to the executors and family of the deceased and also in order that the applicant could suggest a settlement of the claim to avoid publicity. That such suggestion was made by the applicant to one of the executors and thereafter the applicant endeavored to force a settlement of the claim by suggesting to the Surrogate of Nassau County matter of a scandalous nature against one of the executors, which the applicant stated would induce the executor to settle the claim if the Surrogate would request the executor to appear before him, as the executor did not want publicity.

"If a disciplinary proceeding based upon the facts developed in this proceeding had been brought against the applicant in the first instance the court would unquestionably have found him guilty of professional misconduct. (*Matter of Hart*, 131 App. Div. 661; *Matter of Pollack*, 246 id. 211.)

"In my opinion the applicant's motion for reinstatement should be denied."

We could recite many pages of testimony to show the nature of the claim sought to be enforced, but it would serve no useful purpose. In the few excerpts quoted we have given a clear idea of the nature of the testimony.

We need add little to the clear statement of the case made by the referee. He has had considerable experience in hearing similar matters referred to him from time to time by this court.

The Bar must be rid of its unworthy members.

The application for reinstatement to the bar is denied.

McAvoy, O'Malley, Townley and Glennon, JJ., concur.

Application denied.