The People of the State of New York, Respondent, v Richard
Dupont, Appellant.

First Department, March 7, 1985

248

### APPEARANCES OF COUNSEL

*M. Weldon Brewer* of counsel (*Ramsey Clark* and *M. Weldon Brewer,* attorneys), for appellant.

*Bruce Allen* of counsel (*Mark Dwyer* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

FEIN, J.

Defendant appeals from a judgment of Supreme Court, New York County, rendered June 16, 1982, convicting him, after trial (Bentley Kassal, J., and a jury), of two counts of aggravated harassment and one count each of attempted grand larceny in the third degree, tampering with a witness, falsely reporting an incident in the third degree and harassment. Defendant was sentenced to four consecutive one-year terms of imprisonment on the first four counts and concurrent, lesser terms on the remaining convictions. (Defendant's term is actually two years. Penal Law § 70.30 [2] [b].)

 The conviction for aggravated harassment (Penal Law § 240.30, since redesignated aggravated harassment in the second degree) for distributing the magazine entitled *Now East* should be reversed, the sentence imposed thereon should be vacated and the judgment should otherwise be affirmed.

At the outset, it must be noted that defendant was neither charged with nor found guilty of writing, editing or publishing this magazine. His alleged crime under this count was solely for distributing it, which he concedes.

Defendant was charged, in part, with distributing the magazine with intent to harass and annoy the complainant. All of the charges arose out of a dispute defendant had with the complainant, his former attorney, over whether the attorney should continue representing defendant in a real estate matter. When the attorney flatly refused, defendant began a campaign to convince him to change his mind. As time went by, with direct contacts failing to achieve the desired goal, defendant apparently became more and more frustrated. His tactics expanded in frequency and variety, to the point where he threatened and

attempted on several occasions to embarrass the attorney in the eyes of his associates, clients and friends. The totality of defendant's activities, covered by the other counts, need not be elaborated upon here, except for the charge at issue.

Prior to defendant's distribution of the offensive material, it is alleged that he threatened the attorney on the telephone, in June 1979, that defendant would soon be coming out with a book which would be an exposé of the attorney's alleged homosexual lifestyle, replete with cartoons and pictures. The attorney says he hung up on this call, but shortly thereafter received a seven-page mailgram from defendant echoing this threat. In the mailgram, defendant indicated he would now be increasing the size of the book. The title would include the attorney's name in a homosexual context. The book would be "compliment[ed] [*sic*]" with 16 cartoons, some of which defendant described in detail, which would graphically depict the attorney's homosexual lifestyle. Copies of the book would be sent to "judges, lawyers, district attorneys, attorney generals, and perhaps a few senators". Defendant also had a mutual acquaintance attempt to intercede on his behalf with the attorney. This mutual friend testified that he informed the attorney in September 1979 that defendant sounded quite distressed, and that "something would be done in the form of literature, of print-outs, of advertisement and of gags" if the attorney did not change his mind.

The attorney testified that sometime in June of 1980, he received another telephone call in which defendant said that he had "finished the book", and that it contained not only articles, but a number of cartoons which would be "completely embarrassing, sexually embarrassing, embarrassing in every way" to the attorney, his clients and friends. Defendant allegedly promised to distribute this "magazine or book[1] all over New York, all over the world", to everybody he could find who knew or did business with the complainant's firm. The attorney testified that defendant told him the magazine was "just as filthy as [defendant] could make it." When the attorney flatly rejected one last entreaty to take up defendant's case again, defendant allegedly said "all right. Then the magazine is ready to go."

The attorney first saw this magazine, entitled *Now East*, on June 29, 1980. A number of copies had been left in bundles outside his law office. Between then and September 1980 the attorney came across copies of the magazine in at least 15 locations around town, including restaurants and the homes of

---

1. This is the last point in the complainant's testimony where he refers to a "book". From here on, the publication is described as a "magazine".

various friends and clients. The attorney claimed to have seen defendant himself distributing copies outside a restaurant where the attorney was having a luncheon party. On other occasions the attorney saw the magazine being distributed at a charity award ceremony where he was being honored, and at a bat mitzvah he was attending for the daughter of one of his law partners. Although the subject matter is the same as the book defendant supposedly had been working on, there is no identity of the magazine title with the purported title of the book. Only one of the cartoons described in the mailgram appears in the magazine. In addition to the magazine's cartoons, which depict the attorney in a uncomplimentary light, there are pejorative articles about him and some of his clients, as well as references to the real estate dealings which were the subject of the original attorney-client relationship between the attorney and defendant.

Defendant denied that he had made any arrangements to publish a book about the attorney, but only because of lack of resources, notwithstanding his assertions to the contrary in the June 1979 mailgram. He also denied having originated the cartoons described in the mailgram. Defendant further denied having anything to do with the publication of this magazine. He said he had found the magazine, to his "delight and surprise", in boxes on Christopher Street in Greenwich Village on the eve of the "Gay Parade", and had taken a number of boxes (three) and distributed copies as widely as possible to the news media. He denied delivering any to the complainant's law firm. He admitted that he delivered a copy to the District Attorney's secretary, but only when he was informed that the attorney was going to have him prosecuted.

The 10th count of the 14-count indictment charged that defendant, from June 29 to October 29, 1980, "with intent to harass, annoy, threaten and alarm another person, communicated and caused to be initiated a written communication with [the complainant], to wit: a magazine entitled 'Now East', in a manner likely to cause annoyance and alarm." This charge tracks the language of Penal Law § 240.30.

We are of the opinion that the acts described[2] do not constitute a violation of the statute. Penal Law § 240.30 makes it a class A misdemeanor when anyone,

---

2. Defendant was also convicted on one of the other seven counts of aggravated harassment, pertaining to a false telephone report to the police of a crime at the complainant's home in Connecticut, and one count of simple harassment (Penal Law § 240.25) for his general course of conduct toward the complainant over a nine-month period.

"with intent to harass, annoy, threaten or alarm another person * * *

"1. Communicates or causes a communication to be initiated by mechanical or electronic means or otherwise, with a person, anonymously or otherwise, by telephone, or by telegraph, mail or any other form of written communication, in a manner likely to cause annoyance or alarm".

Throughout the history of the harassment statute in its various forms running back more than a century, it has not been applied to make the mere distribution of printed material a crime. A review of the cases reveals that prior versions of the statute have classically been applied as a protection against the coercive threats of the incessant bill collector (*see, e.g., People v Globe Jewelers,* 249 App Div 122; *People v Wickes,* 112 App Div 39; *People v Loveless,* 84 NYS 1114; 1929 Opns Atty Gen 126, 127-29), or the violation of one's privacy by means of obscene telephone calls (*People v Cirruzzo,* 53 Misc 2d 995; *People v Anonymous,* 52 Misc 2d 772).

The early predecessors of the harassment statute were closely associated with the crime of attempted extortion (*see, Biggs v People,* 8 Barb 547; *People v Griffin,* 2 Barb 427). In 1878, the Legislature enacted a prohibition against any threat to communicate, publish or otherwise use information, documents or statements allegedly injurious to the personal reputation or business standing of another, with intent to extort property or valuable benefit thereby (L 1878, ch 288). Three years later, the codification of the Penal Law severed this connection between the threatening communication and the element of extortion (*see, People ex rel. Perry v Gillette,* 200 NY 275), and made it a misdemeanor merely when any "person who, knowing the contents thereof, sends, delivers, or in any manner causes to be sent or received any letter or other writing, threatening to do any unlawful injury to the person or property of another". (Penal Code of 1881 § 559.) In 1891, this law was amended to include the sending of any "letter, postal card or writing", signed or unsigned, "with intent thereby to cause annoyance to any person" (L 1891, ch 120). This was the version in which this statute appeared in the next codification, Penal Law of 1909 § 551. It was subsequently amended in 1917 to include abuse of process (*cf. Foley v Xavier,* 104 App Div 1). Combined with the statutory proscriptions against harassing telephonic communications (i.e., for malicious or illegitimate purpose), this is the form in which the class A misdemeanor of aggravated harassment emerged in the Penal Law of 1965 (§ 240.30), basically as it existed at the time of this prosecution.

The harassment statute, in its various formulations, including the present codification, does not appear to have been relied upon as the basis for punishing any but annoying and harassing communications transmitted directly to the complainant. It was not designed to prevent dissemination, let alone the publication of vexatious material about an individual. There may be civil remedies for such conduct. Offensive as defendant's activities may have been, they did not violate the statute.

Two recent cases challenging the constitutionality of the statute demonstrate its purpose. In *People v Smith* (89 Misc 2d 789, *cert denied* 434 US 920) the defendant was convicted of aggravated harassment premised upon the fact that he made at least 27 calls to the desk officer at the White Plains Police Department in regard to a complaint that he had made. He was repeatedly advised that the matter was civil rather than criminal in nature and that the police could not take any action with respect to it. Nevertheless, in the next 3 hours and 20 minutes, defendant called 27 more times making the identical complaint, although he was told again and again to stop calling because he was tying up police lines. As the court found, although the defendant initially had a purpose of legitimate communication, it was clear that with respect to the later calls his intent was not to communicate but solely to harass. Even though the content of the communication was unobjectionable, it was directed to an unwilling listener in circumstances wherein "substantial privacy interests are being invaded in an essentially intolerable manner" (*Cohen v California,* 403 US 15, 21).

Since the repeated telephone calls in *Smith* (*supra*) were obviously for a purpose expressly within the language of the statute, any claim that the statute was unconstitutional because of vagueness was not available to the defendant there.

The *Smith* court went on to note that the defendant's constitutional challenge on the ground of vagueness was without merit as to him because " 'even if the outermost boundaries of [the statute are] imprecise, any such uncertainty has little relevance here, where appellant's conduct falls squarely within the "hard core" of the statute's proscriptions' " (*People v Smith, supra,* p 791, citing *Broadrick v Oklahoma,* 413 US 601, 608, and *Parker v Levy,* 417 US 733, 756).

However, in our case, there is no direct communication, there is no interference with privacy, nor is there a use or tying up of phone lines. There is merely the distribution of literature, offensive though it may be. Such conduct is plainly not within the "hard core" of the statute's proscriptions.

It is not at all clear from the language of the statute whether it was intended to proscribe the distribution of literature accusing another of homosexuality or of sharp or dishonest dealing, albeit such literature might possibly ground a civil action for defamation. Nothing in the history or language of the statute indicates with clarity that such conduct is proscribed. Thus, even though the statute was found to be constitutional in *Smith* (*supra*), such finding does not preclude a determination that as applied to this defendant the statute is void for vagueness.

The vagueness is apparent. It is not clear what is meant by communication "in a manner likely to cause annoyance or alarm" to another person. Is it the form of distribution which is being condemned, or the content of the communication? How does one measure "annoyance"? It is well settled that, as ruled in *Smith v Goguen* (415 US 566, 574): "Due process requires that all 'be informed as to what the State commands or forbids,' *Lanzetta v. New Jersey,* 306 U.S. 451, 453 (1939), and that 'men of common intelligence' not be forced to guess at the meaning of the criminal law. *Connally v. General Construction Co.,* 269 U.S. 385, 391 (1926)."

To the same effect is *United States v Harriss* (347 US 612). On the face of the statute it would be difficult for one to know that the criminal sanctions were applicable to the distribution of this magazine. The statute is vague, at least as applied to this defendant.

Plainly, not every scurrilous or unsavory communication concerning an individual, no matter how repulsive or in what degree of poor taste, necessarily constitutes criminally harassing conduct. Where the interests of an individual are harmed there may be a civil remedy by action for damages or injunctive relief. The criminal law may not be applied for this purpose. The harassment statute was not meant as a substitute for the laws of defamation.

Read in this light, the statute was merely misapplied to count 10, and the question of constitutional infirmity can be avoided (*Hirson v United Stores Corp.,* 263 App Div 646, 650, *affd* 289 NY 564). On the other hand, the distinct possibility that the statute might again be similarly applied in the future, thereby forcing others to refrain from engaging in constitutionally protected speech or expression, should give this defendant standing to challenge this overly broad application (*Broadrick v Oklahoma, supra,* p 612). The fact that certain modes of expression may be "annoying to others" does not require an individual to forfeit his right to make such assertions (*Papish v Board of Curators,* 410 US 667).

Although it may be argued that the magazine was obscene, this is neither an obscenity prosecution nor an obscenity statute. Nor may the constitutionality of the statute be sustained as to this defendant upon the ground that "by their very utterance" the contents of the magazine "tend to incite an immediate breach of the peace" (*Chaplinsky v New Hampshire,* 315 US 568, 572).

In effect, defendant's conviction as to this count violated his 1st Amendment rights in that he was punished for exercising his right to free speech. *People v Dinan* (118 Misc 2d 857), sustaining the constitutionality of the statute, makes the point even more clearly. There the defendant, while attempting to enter the complainant's home by force, threatened that he was "going to get you f — - Jews". There was something more than speech. There was a threat of force and an attempt to enter the complainant's home. Albeit the statute might inhibit speech, under the circumstances the defendant in that case was not engaged in mere speech. As stated in *Chaplinsky v New Hampshire (supra,* pp 571-572), "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words — those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."

The preferred position of the 1st Amendment, the right to freedom of speech, is beyond dispute (*Saia v New York,* 334 US 558, 561-562). This means that the 1st Amendment freedoms must be given weighty consideration in balancing them against the interests underlying challenged statutes. The right to raise such an issue transcends the parties and controversies in litigation.

Concededly, the primacy of the 1st Amendment is not absolute. The Constitution does not provide for unfettered right of expression. However, only a compelling State interest can justify limiting 1st Amendment freedoms. Where speech is involved, the magnitude of State interest underlying the regulation must be balanced against the impact of the regulation on freedom of speech, and the regulation can be sustained only where the State interest is compelling. Surely it cannot be said that such State interest as there may be in protecting individuals against criticism of their sexual habits or their financial dealings can justify the prosecution in this case. In this respect the regulation must be carefully drawn so that the deterrent

effect on free speech is no greater than is absolutely necessary to foster the compelling interest necessitating the statute (*Cantwell v Connecticut,* 310 US 296, 307).

The statute must be narrowly tailored to further the State's legitimate interest (*Grayned v City of Rockford,* 408 US 104, 116-117). If it is not so "narrowly tailored", but instead impedes 1st Amendment rights, the statute is unconstitutional "on its face", or in other terms "unconstitutionally overbroad" (*Grayned v City of Rockford, supra; see, Shelton v Tucker,* 364 US 479, 488). In order to insure that such a statute may not chill the rights of others, the parties against whom the statute may constitutionally be applied will have standing to challenge it for overbreadth. Thus, in such cases there is "no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity" (*Dombrowski v Pfister,* 380 US 479, 486). On this basis a litigant may challenge a statute, not because his own rights of free expression are violated, but because of the danger that the statute's very existence may cause others, not before the court, to refrain from constitutionally protected speech or expression (*Broadrick v Oklahoma,* 413 US 601, 612, *supra*).

■ It cannot be doubted that a statute drawn in so narrow a form as to criminally punish one who describes another as a homosexual, or as one who engages in sharp or dishonest practice in law or in real estate or other deals, would be unconstitutional. The application of this statute to accomplish this end demonstrates that the statute, on its face, is vague and overbroad. If not unconstitutional on its face, it is at least unconstitutional as applied to the defendant, unlike *Chaplinsky v New Hampshire* (315 US 568, *supra*), where the danger to public safety was involved, or other cases in which the speech was accompanied with a threat of violence, or engaged in under such circumstances as to incite violence.

Thus, defendant has standing to challenge the facial unconstitutionality of the statute on the ground of overbreadth because, as applied to him, it is vague and overbroad. What is sought to be proscribed is the right of free speech (*Gooding v Wilson,* 405 US 518; *Broadrick v Oklahoma, supra*).

The right of free speech embraces the right to distribute literature (*Martin v City of Struthers,* 319 US 141, 143; *Lovell v Griffin,* 303 US 444). The fact that certain modes of expression may be "annoying" to others does not require an individual to forfeit his right under the 1st Amendment to make those expres-

sions (White, J., dissenting from a denial of certiorari in *Gormley v Director, Conn. State Dept. of Adult Probation,* 449 US 1023). In *Papish v Board of Curators* (410 US 667, *supra*), a student was expelled for distributing on campus a publication containing indecent speech. The objectionable material included a distasteful political cartoon, and an article under the headline "M —— - f —— - Acquitted". The Supreme Court held that the student's expulsion constituted a violation of her free speech rights under the 1st Amendment. Regardless of how offensive the material might be to standards of good taste, the mere dissemination of ideas in printed form cannot be proscribed in the name of "conventions of decency". Neither the distasteful cartoon nor the offensive headline article could be labeled constitutionally obscene or otherwise unprotected by the 1st Amendment (410 US, at p 670).

While it is true that not every resort to epithet or personal abuse will be viewed as a communication safeguarded by the Constitution (*Cantwell v Connecticut,* 310 US 296, 309-310, *supra*), the "fighting words" exception set forth in *Chaplinsky* (*supra*) will only apply where the expression of ideas was accomplished in a manner likely to cause a breach of the peace (*Cohen v California,* 403 US 15, 20, *supra; cf. Chaplinsky v New Hampshire, supra,* pp 571-572). Even if the material in the magazine was provocative, that would not render its distribution the equivalent of "fighting words" so as to except such activity from the protection of the 1st Amendment. Defendant's distribution of *Now East* was neither a violent nor a potentially violent act.

Count 10 of the indictment was an overly broad effort to apply Penal Law § 240.30 to a constitutionally protected activity, viz., the distribution of a magazine in an arguably annoying manner. A statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void on its face, as contrary to the 14th Amendment (*Winters v New York,* 333 US 507). As such, section 240.30 is unconstitutional as applied in this instance, and count 10 should have been dismissed.

This disposition should have no effect on the ultimate sentence received by defendant. Convicted on 6 of the 14 counts in the indictment, defendant was sentenced to consecutive one-year prison terms on each of the four class A misdemeanors (including count 10), plus concurrent terms of 90 days for a class B misdemeanor and 15 days for a violation. The net effect of this sentence was imprisonment for two years (Penal Law § 70.30 [2]

[b]). Elimination of one of the definite one-year terms of imprisonment will not alter that sentence.

The judgment of Supreme Court, New York County (Kassal, J., and a jury), rendered June 16, 1982, convicting defendant of two counts of aggravated harassment and one count each of attempted grand larceny in the third degree, tampering with a witness, falsely reporting an incident in the third degree and harassment, and sentencing him to four consecutive one-year terms of imprisonment on the first four counts and concurrent lesser terms on the remaining convictions, should be modified by reversing the conviction only to the extent of dismissing count 10 of the indictment and vacating the sentence imposed thereon, and should otherwise be affirmed.

CARRO, J. P., BLOOM and MILONAS, JJ., concur.

Judgment, Supreme Court, New York County, rendered on June 16, 1982, unanimously modified, by reversing the conviction only to the extent of dismissing count 10 of the indictment and vacating the sentence imposed thereon, and otherwise affirmed.