**Carlos VIVES, Plaintiff,**

v.

**THE CITY OF NEW YORK; Raymond Kelly, Commissioner of the New York City Police Department; Ming Y. Li, a Detective of the New York City Police Department, and Manwai Lui, a Detective of the New York City Police Department, Defendants.**

No. 02 Civ. 6646SAS.

United States District Court, S.D. New York.

Nov. 24, 2003.

Christopher Dunn, Arthur Eisenberg, Donna Lieberman, New York Civil Liberties Union Foundation, New York, New York, for Plaintiff.

Katie O'Connor, Assistant Corporation Counsel, New York City Law Department, New York, New York, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

In this Information Age, Americans are bombarded daily with unsolicited commu-

nications, by telephone, fax, email, and mail. The vast majority view these communications as, at a minimum, annoying—email boxes filled with spam, prerecorded advertisements left on telephone answering machines, mail slots jammed with credit card applications, catalogs and brochures.[1] Some of the communications go beyond annoying, and rise to the level of alarming—emails that threaten the recipient with harm if the email is not forwarded to a certain number of people, or warn the user that the contents of a computer are not secure from hackers and viruses unless a particular product is purchased and downloaded. This opinion addresses whether, consistent with the First Amendment, the government may limit or proscribe speech that is intended to annoy or alarm.

## I. FACTS

Carlos Vives filed this action for declaratory and injunctive relief, as well as compensatory and punitive damages, alleging, *inter alia*, that his First and Fourth

Amendment rights were violated when he was arrested pursuant to section 240.30(1) of the New York Penal Law ("section 240.30(1)").[2] Vives seeks a declaration that this statute is unconstitutional to the extent it authorizes the arrest of a person who mails nonthreatening materials, when such materials are mailed with the intent to "annoy" or "alarm." Vives also seeks an order enjoining the New York City Police Department ("NYPD") from arresting people who violate this law."[3] Finally, Vives seeks compensatory and punitive damages pursuant to 42 U.S.C. § 1983 ("section 1983"), and New York common law. Vives now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and defendants cross move for summary judgment.

### A. Background

Vives is a 66–year–old resident of New York City who resides with his mother and brother. For the past twenty years, Vives has mailed written materials regarding re-

---

1. The public's overwhelming response to the recently effective National Do Not Call Registry, the legislative and judicial activity surrounding the registry, and the increasing number of parallel state registries, evidence the extent to which Americans find unsolicited communications to be irritating. *See* www.donotcall.gov; Jon Herskovitz, *Federal Judges Question Telemarketers on Privacy at* www.forbes.com/markets/newswire/2003/11/10/rtr1142674.html (Nov. 10, 2003) ("More than 54 million Americans have signed up for the do-not-call list since it was rolled out in June.").

2. Section 240.30(1) states:

 A person is guilty of aggravated harassment in the second degree when, with intent to harass, annoy, threaten or alarm another person, he or she [ ][c]ommunicates, or causes a communication to be initiated by mechanical or electronic means or otherwise, with a person, anonymously or otherwise, by telephone, or by telegraph, mail or any other form of written communication,

in a manner likely to cause annoyance or alarm ... Aggravated harassment in the second degree is a class A misdemeanor. N.Y. Penal Law § 240.30(1) (McKinney's 2003). The statute does not define "annoy" or "alarm."

3. Pursuant to 28 U.S.C. § 2403(b), District Judge John S. Martin, to whom this matter originally was assigned, notified the New York State Attorney General of this case and the challenge it presented to "the constitutionality of section 240.30(1) of the New York State Penal Law as it applies to nonthreatening materials protected by the First Amendment." *Vives v. City of New York*, 02 Civ. 6646, Certification Order (S.D.N.Y. Mar. 21, 2003). Despite the Certification Order, the State of New York has not appeared in this action. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.Opp.") at 3; Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def.Opp.") at 3.

ligious and political issues to thousands of people. The mailings include Vives's handwritten and typed statements, as well as copies of stories and other items taken from general circulation newspapers. Vives mails the materials to "people of the Jewish faith with the intent to alarm them about current world events that have been prophesied in the Bible, including the unification of the European countries into a single political and military entity." 8/21/03 Affidavit of Carlos Vives ("Vives Aff.") ¶¶ 2, 3, 4.

In early 2002, Vives sent his religious and political materials to Jane Hoffman, a candidate for New York State Lieutenant Governor.[4] Vives, who had never previously mailed anything to Hoffman, learned about her in a Jewish publication. *See id.* ¶¶ 6, 8. The envelope in which the materials were sent was addressed to Hoffman, but the materials themselves were not addressed to anyone specifically, and were not accompanied by any personalized letter. Additionally, on the first page of the materials that he sent to Hoffman, Vives handwrote his first initial and last name, as well as his address. *See* Ex. A to the Vives Aff.; Ex. C to the O'Connor Dec.

On April 3, 2002, after Hoffman had received Vives's letter, defendant-detectives Ming Li ("Li") and Manwai Lui ("Lui") went to Hoffman's campaign office. Ademola Oyefesso, Hoffman's campaign manager, informed the detectives that Hoffman found Vives's mailing to be "alarming and/or annoying." Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def.Mem.") at 5. Li prepared a complaint report which stated that Vives's letter to Hoffman "does not have any threaten [sic] wording on it. Most of the letter contains

political and religious statements and photocopy of a cutout newspaper article." 4/3/02 NYPD Report, Ex. E to 8/25/03 Affirmation of Christopher Dunn, plaintiff's counsel ("Dunn Aff.").

At the instruction of Li's supervising lieutenant, at approximately 9:15 a.m. on April 6, 2002, Li and Lui went to Vives's home. After they identified themselves and asked for Vives, they were invited into the apartment. Li asked Vives whether he had "written a letter." 1/16/03 Deposition of Ming Li ("Li Dep."), Ex. E to the O'Connor Dec., at 69. Vives responded that he had written many letters. Li then asked Vives to accompany the detectives to the precinct. Vives asked why, and Li told him that the mayor wanted to see him. *See id.* Apparently neither Li nor Lui told Vives that he was being arrested. Vives believed that the officers were taking him to see Mayor Bloomberg. *See* 4/22/03 Deposition of Carlos Vives, Ex. D to the O'Connor Dec., at 140–41.

Vives eventually agreed to go to the precinct, though at first he expressed disbelief that Li and Lui were police officers with the NYPD, and called 911 to verify that they were not imposters. Vives then changed his clothes, took $337 with him, and left with the officers. Initially, Vives resisted being handcuffed and put in the unmarked police car, but he ultimately was cuffed and transported to the fifth precinct. *See* Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1 Stmt.") ¶¶ 32, 34, 35, 37, 39, 42, 43, 46, 49–53; Plaintiff's Response to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1 Res.") ¶¶ 32, 34, 35, 37, 39, 42, 43, 46, 49–53.

---

4. Copies of the materials that were sent to Hoffman were provided to the Court by both plaintiff and defendants. *See* Ex. A to the Vives Aff.; Ex. C to the 8/25/03 Declaration of Katie C. O'Connor, defendants' counsel ("O'Connor Dec.").

Once at the precinct, Vives was placed in a holding cell, and $300 of his $337 was turned over to the desk clerk. Li subsequently told Vives that he was being charged with aggravated harassment for sending materials to Hoffman. However, the District Attorney's office declined to prosecute Vives. *See* Def. 56.1 Stmt. ¶¶ 54–56; Pl. 56.1 Res. ¶¶ 54–56. At approximately 8:30 p.m. on the same day he was arrested, Vives was released. *See* Plaintiff's Local Rule 56.1 Statement of Proposed Findings of Fact ¶ 26; Defendants' Response to Plaintiff's Rule 56.1 Statement of Proposed Findings of Fact ¶ 26.

Since his arrest, Vives has continued to mail religious and political materials to members of the public and public officials. Because of the arrest, however, he now fears that he may be arrested again. Thus, although Vives feels that it is important for him to identify himself on his mailings, he no longer writes his name and address on the materials. *See* Vives Aff. ¶ 11. Moreover, on March 25, 2003, two NYPD police officers went to Vives's apartment and questioned him about his mailing of political and religious materials. They left without providing an explanation for their questions. *See id.* ¶ 13.

### B. The Complaint

Vives alleges that his arrest, pursuant to section 240.30(1), violated his First and Fourth Amendment rights, as well as parallel rights guaranteed by Article I, sections 8 and 12 of the New York Constitution and New York common law. *See* First Amended Complaint ("Compl.") ¶¶ 34–41. Specifically, Vives claims that section 240.30(1) unconstitutionally proscribes protected speech, he was arrested for exercising his right to engage in protected speech, and any arrest premised on section 240.30(1) and his constitutionally

protected conduct therefore lacked probable cause. Vives seeks compensatory and punitive damages, as well as a declaration that section 240.30(1) is unconstitutional to the extent that it proscribes speech that is "annoying or alarming," and an injunction prohibiting the NYPD Commissioner from enforcing section 240.30(1) against persons who engage in the "annoying or alarming" conduct that the statute purports to prohibit. *See* Compl. at *ad damnum* clause ¶¶ 2–4, 6, 7. Vives also seeks an injunction directing the defendants to "return to the plaintiff all documents reflecting his arrest and detention and ordering the defendants to expunge all computer information reflecting the plaintiff's arrest and detention." *Id.* ¶ 5.

## II. APPLICABLE LAW

### A. Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material if "it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

"In determining whether a genuine issue of material fact exists, a court must resolve

all ambiguities and draw all reasonable inferences against the moving party." *Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir.2001); *see also Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir.2003). Summary judgment is inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.2000)).

## B. Qualified Immunity

"When government officials abuse their offices, actions for damages may offer the only realistic avenue for vindication of constitutional guarantees. On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations, quotations and alterations omitted); *see also Locurto v. Safir*, 264 F.3d 154, 162–63 (2d Cir.2001) (the qualified immunity "doctrine strikes a balance between the need [ ] to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury").

The courts have accommodated these concerns by providing qualified immunity to damages liability for officials performing discretionary functions, as long as "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *See id.* at 638–39, 107 S.Ct. 3034 (citing *Malley v. Briggs*,

475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978)). Because this qualified immunity is "an immunity from suit rather than a mere defense to liability, [the Supreme Court] repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citations, quotations and alterations omitted); *see also Mitchell*, 472 U.S. at 527–28, 105 S.Ct. 2806 ("[I]t follows from the recognition that qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated."); *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir.2003) (whether a defendant is entitled to qualified immunity may be determined by summary judgment where there are no material factual disputes).

A court's determination of whether a defendant is entitled to qualified immunity is a two-step inquiry. The court must first ask whether, "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for the further inquiry." *Id.* On the other hand, if the allegations indicate that a constitutional violation may have occurred, the court then asks "whether the right was clearly estab-

lished". This inquiry [ ] must be undertaken in light of the specific context of the case, not as a broad general proposition ... The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.[5] *Id.* at 201–02, 121 S.Ct. 2151; *see also Loria v. Gorman,* 306 F.3d 1271, 1282 (2d Cir.2002) ("[I]f the officer's conduct violated a right, [courts] analyze the objective reasonableness of the officer's belief in the lawfulness of his actions. If the officer reasonably believed that his actions did not violate the plaintiff's rights, he is entitled to qualified immunity even if that belief was mistaken.") (citations omitted).

■ An officer's conduct will be deemed reasonable, and therefore entitled to qualified immunity, even if it was based on mistaken judgment, *see Hunter,* 502 U.S. at 229, 112 S.Ct. 534, because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley,* 475 U.S. at 342, 106 S.Ct. 1092; *see also Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. Thus, "if the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 (emphasis added); *see also Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) ("If [ ] the law [ ] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to know that the law forbade conduct not previously identified as unlawful.") (quotation omitted).

■ Thus, where officers participate in constitutionally impermissible conduct, but do so pursuant to a state statute or practice that has not previously been declared unconstitutional, they *may* be entitled to qualified immunity. *See Hope v. Pelzer,* 536 U.S. 730, 739–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). This is so because officers have a right to fair notice that their conduct is improper. *See id.* at 739–40, 122 S.Ct. 2508 ("In light of pre-existing law the unlawfulness [of the officers' conduct] must be apparent ... Officers sued in a civil action for damages under 42 U.S.C. § 1983 have [a] right to fair notice" (citations and quotations omitted)); *see also Connecticut ex rel. Blumenthal v. Crotty,* 346 F.3d 84, 102 (2d Cir. 2003) (officers entitled to qualified immunity where the statute pursuant to which they were acting violated the Privileges and Immunities Clause). On the other hand, "though officials are not required to anticipate subsequent legal developments, a right may have been clearly defined even if the defendants' specific action had not previously been held unlawful if, *in light of pre-existing law,* the unlawfulness of the action was apparent." *In re State Police Litig.,* 88 F.3d 111, 123 (2d Cir.1996) (citations, quotations and alterations omitted) (emphasis added); *see also Hope,* 536 U.S. at 741, 122 S.Ct. 2508 ("a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful ... cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established" (quotations and alterations omitted)).

---

**5.** This two-step process is mandatory, and a court may not determine whether the conduct was reasonable without first inquiring into whether a constitutional right may have been violated. *See Ehrlich v. Town of Glastonbury,* No. 02–7839, 2003 WL 22382931, at *5–7 (2d Cir. Oct.17, 2003) (citing *Saucier',* 533 U.S. 194, 121 S.Ct. 2151).

## C. First Amendment Law

 The First Amendment, applicable to the states through the Fourteenth Amendment, states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[6] Although the rights guaranteed by the First Amendment are not absolute, as a general matter, the Government may not limit or prohibit speech. *See Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 245, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) ("As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear."); *see also Elrod v. Burns,* 427 U.S. 347, 360, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

> The hallmark of the protection of free speech is to allow 'free trade in ideas'— even ideas that the overwhelming majority of people might find distasteful or discomforting. *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); *see also Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). Thus, the First Amendment 'ordinarily' denies a State the 'power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence.' *Whitney v. California,* 274 U.S. 357, 374, 47 S.Ct. 641, 71 L.Ed. 1095 (1927).

*Virginia v. Black,* 538 U.S. 343, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535 (2003). This protection applies as much to written materials sent through the mails, as it does to verbal communications. *See Lamont v. Postmaster General of the United States,* 381 U.S. 301, 305, 85 S.Ct. 1493, 14 L.Ed.2d 398 ("the use of the mails is almost as much a part of free speech as the right to use our tongues") (citing *United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson,* 255 U.S. 407, 437, 41 S.Ct. 352, 65 L.Ed. 704 (1921) (Holmes, J., dissenting)).

 The primacy of the First Amendment is not, of course, absolute—it does not provide for unfettered free expression. Thus, the First Amendment does not protect "certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children." *Free Speech Coalition,* 535 U.S. at 246, 122 S.Ct. 1389 (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 127, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)); *see also R.A.V. v. City of St. Paul,* 505 U.S. 377, 383–84, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). A state may punish words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Both "fighting words"—words that are likely to provoke a violent reaction when heard by an ordinary citizen—and "true threats" may be proscribed without offending the First Amendment. *See Cohen v. California,* 403

---

**6.** The First Amendment and the free speech clause of the New York Constitution, Art. I § 8, are co-extensive, such that a statute that violates one also violates the other. *See People v. Dietz,* 95 N.Y.2d 47, 50 n. 1 (1989). Notably, the same is true of the Fourth Amendment's protection from unlawful arrest

and Article I section 12 of New York's Constitution. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995); *Hygh v. Jacobs,* 961 F.2d 359, 366 (2d Cir.1992); *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir. 1991)).

U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (fighting words); *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (true threats). *See also R.A.V.*, 505 U.S. at 388, 112 S.Ct. 2538; *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 123 S.Ct. at 1548 (citing *Watts*, 394 U.S. at 708, 89 S.Ct. 1399 ("political hyperbole" does not constitute a true threat)).

▇▇ Moreover, where speech is regulated or proscribed based on its content, the scope of the effected speech must be clearly defined "because of [the] obvious chilling effect on free speech." *See Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Speakers, uncertain as to whether particular speech is permissible, may refrain from exercising their First Amendment rights with respect to fully protected speech. *See Dombrowski v. Pfister*, 380 U.S. 479, 494, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (overly broad and vague statute restricting speech creates a "danger zone within which protected expression may be inhibited" (quotations omitted)). This is especially true where the regulation is a criminal statute because "[t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images ... [T]his increased deterrent effect, coupled with the risk of discriminatory enforcement of vague regulations, poses great[ ] First Amendment concerns." *Id.* at 872, 117 S.Ct. 2329. *See also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048–51, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) ("The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement."); *Dombrowski*, 380 U.S. at 494, 85 S.Ct. 1116 ("So long as the [vague and over broad] statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression.").

## III. DISCUSSION

### A. Was There a Constitutional Violation?

#### 1. Annoying and Alarming Speech

▇▇ Since 1982, Vives has sent approximately 27,000 copies of his political and religious materials to various people. *See* Def. 56.1 Stmt. ¶ 4; Pl. 56.1 Res. ¶ 4. Undoubtedly, some or all of the recipients have found the materials to be annoying, alarming, or both. Hoffman, through her campaign manager, told detectives Li and Lui that she found the mailing to be annoying and/or alarming, *see* Def. Mem. at 5, and the Court does not doubt the veracity of her statement. Moreover, Vives *acknowledges* that he intends to alarm the recipients of his mailings. *See* Vives Aff. ¶ 4. But neither the fact that Vives intends to annoy and/or alarm, nor the fact that the mailings do annoy and/or alarm the recipients, can be a basis for arresting or prosecuting Vives, because Vives has a constitutionally protected right to engage in this conduct. *See Black*, 123 S.Ct. at 1547; *Free Speech Coalition*, 535 U.S. at 245, 122 S.Ct. 1389.

Vives's communications do not fall into one of the defined categories of unprotected speech such as defamation, incitement, obscenity, or child pornography. *See Free Speech Coalition*, 535 U.S. at 246, 122

S.Ct. 1389. Nor do they constitute unprotected "true threats," because they are not "serious expression[s] of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black,* 123 S.Ct. at 1548. In fact, Vives's mailing are nothing more than communications "that the overwhelming majority of people might find distasteful or discomforting." *Abrams,* 250 U.S. at 630, 40 S.Ct. 17 (1919). But the Supreme Court has made very clear that such communications are fully protected speech that may not be proscribed or punished. *See Black,* 123 S.Ct. at 1548; *Johnson,* 491 U.S. at 414, 109 S.Ct. 2533; *Whitney,* 274 U.S. at 374, 47 S.Ct. 641. As such, Vives mailings are firmly protected by the First Amendment, and may not be proscribed or punished.

## 2. Section 240.30(1)

Section 240.30(1) was enacted in 1965 and amended in 1969. Yet, for nearly half of its thirty-eight year history, the statute's constitutionality has been questioned. Beginning in 1985, the Appellate Division, First Department, stated that section 240.30 is unconstitutional to the extent that it proscribes "annoying" expression that falls short of "fighting words," because "[t]he fact that certain modes of expression may be 'annoying' to others does not require an individual to forfeit his right under the First Amendment to make those expressions." *People v. Dupont,* 107 A.D.2d 247, 486 N.Y.S.2d 169, 176 (1st Dep't 1985). The defendant in *Dupont* was arrested and prosecuted under section

240.30(1) for mailing copies of a magazine containing articles that attacked a particular individual. After a lengthy discussion of the history of the statute, as well as the First Amendment, the court reversed the conviction under section 240.30(1), stating that "a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void on its face, as contrary to the Fourteenth Amendment." *Id.* at 177. Despite this very strong language, the court went on to limit its holding to the particular facts of the case before it. *See id.*

Four years later, New York's Court of Appeals considered the constitutionality of former section 240.25 of New York's Penal Law, a statute that was substantially similar to the statute at issue in this case.[7] That statute, much like section 240.30, proscribed communications made with the intent to "annoy" or "alarm." In striking down section 240.25 as unconstitutionally over broad, the Court of Appeals emphasized that the communications the statute prohibited did not "fall within the scope of constitutionally proscribable expression, which is considerably narrower than that of the statute." *People v. Dietze,* 75 N.Y.2d 47, 51, 550 N.Y.S.2d 595, 549 N.E.2d 1166 (1989). The Court went on to note that "[s]peech is often 'abusive'—even vulgar, derisive, and provocative—and yet it is still protected under the State and Federal constitutional guarantees of free expression unless it is much more than that." *Id.* The Court further said that

---

7. Section 240.25, now revised, formerly stated, in pertinent part:
A person is guilty of harassment when, with intent to harass, *annoy or alarm* another person:
1. He strikes, shoves, kicks or otherwise subjects him to physical contact, or attempts or threatens to do the same; or

2. In a public place, he uses abusive or obscene language, or make an obscene gesture.
N.Y. Penal Law § 240.25 (repealed) (emphasis added).

section 240.25 could not be judicially interpreted to apply only to "constitutionally proscribable speech [because the] result [would be a] transform[ation] of an otherwise overbroad statute into an impermissibly vague one; the statutory language would signify one thing but, as a matter of judicial decision, would stand for something entirely different." *Id.* at 53, 550 N.Y.S.2d 595, 549 N.E.2d 1166. The Court of Appeals therefore held that former section 240.25 was invalid.

Judge Charles Brieant of this Court considered the constitutionality of section 240.30(1) in 1997, in the context of an action to enjoin the Orange County District Attorney's Office from prosecuting a defendant under section 240.30(1). In taking the unusual step of ordering the injunction, Judge Brieant, relying on *Dupont,* held that "Penal Law § 240.30(1) is over broad as well as vague. It is unclear what type of communication would be considered to be initiated 'in a manner likely to cause annoyance or alarm' to another person ... The statute in this case is utterly repugnant to the First Amendment of the United States Constitution and also unconstitutional for vagueness ... [which] a New York Court in *Dupont* so held, and clearly, in 1985." (*Schlagler v. Phillips,* 985 F.Supp. 419, 421 (S.D.N.Y.1997), rev'd on other grounds, 166 F.3d 439 (2d Cir. 1999)) (citing *Dupont,* 107 A.D.2d 247, 486 N.Y.S.2d 169).

Finally, last term, the New York Court of Appeals suggested that section 240.30(1) may be unconstitutionally over broad. In *People v. Mangano,* No. 67, Memorandum Opinion (N.Y. Ct. of Appl., July 2, 2003), the defendant was convicted under section 240.30(1) for leaving messages on a village answering machine that "rained invective on two Village employees, wished them and their families ill health, and complained of their job performance, as well as tickets that she had received." *Id.* at 2. The Court reversed the conviction without considering the constitutionality of section 240.30(1), but held, "We cannot agree with the People's argument that appellant's messages fall within any of the proscribable classes of speech or conduct." *Id.* at 3.

██ This rather dubious history raises questions regarding why state and local police officers and prosecutors have continued to arrest and prosecute persons for intentionally communicating in a manner likely to "annoy" or "alarm." Though section 240.30(1) has never before been declared unconstitutional on its face, its fate has been foreshadowed since 1985. The fact that Vives was arrested pursuant to section 240.30(1) for engaging in conduct that is firmly protected by the First Amendment, and that he no longer feels free to put his name and address on his mailings, exemplifies why section 240.30(1) cannot be reconciled with the First Amendment. Section 240.30(1) is therefore unconstitutional to the extent it prohibits communications, made with the intent to annoy or alarm,[8] by "mechanical or

---

8. Because I find that section 240.30(1) is unconstitutional to the extent it prohibits and punishes speech that is intended to "annoy" and/or "alarm," I need not reach the issue of whether the statute's failure to define those terms renders it unconstitutionally vague. I note, however, that in striking down former section 240.25(2) of the Penal Law, the New York Supreme Court held that the statute's prohibition against "abusive" language intended to "annoy" was both unconstitutional-

ly over broad and vague. *See Dietze,* 75 N.Y.2d at 52, 550 N.Y.S.2d 595, 549 N.E.2d 1166. Furthermore, in *Dupont,* 486 N.Y.S.2d at 174, the court noted, in dicta, that "[t]he vagueness [of section 240.30(1)] is apparent. It is not clear what is meant by communication 'in a manner likely to cause annoyance or alarm' to another person. Is it the form of communication or the content of the communication? How does one measure 'annoyance'?".

electronic means or otherwise, with a person, anonymously or otherwise, by telephone, or by telegraph, mail or any other form of written communication, in a manner likely to cause annoyance or alarm." [9] Vives is entitled to damages for this violation of his First Amendment rights.

### 3. Unlawful Arrest

 Because this aspect of section 240.30(1) is unconstitutional, any arrest and detention premised on it violates the Fourth Amendment's protection from unlawful seizures. *See* U.S. Const. amend. IV; *see also Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring) ("[T]echnical violations of Fourth Amendment rights [occur] where [ ] officers in good faith arrest an individual in reliance on a warrant later invalidated or pursuant to a statute that subsequently is declared unconstitutional."). Although Vives's Fourth Amendment rights as well as his rights under the New York Constitution and New York common law were violated, he is not necessarily entitled to damages for the wrongful arrest. Before he can recover such damages, Vives must first establish that the arresting officers lacked good faith and probable cause. *See Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (holding that the defense of good faith and probable cause is available to officers in common law actions for false arrest and imprisonment, as well as in actions brought pursuant to section 1983).

 Probable cause to arrest exists "when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991). Defendants argue that Lui and Li arrested Vives with probable cause and in good faith because they had trustworthy information—Hoffman's complaint and the written materials Vives sent to Hoffman, which included his last name and address—to warrant their belief that Vives had violated section 240.30(1).[10] Although Li and Lui certainly had probable cause to believe that Vives had violated section 240.30(1) at the time of his arrest, I cannot conclude, as a matter of law, that they acted in good faith. *See infra* Part III.B. Therefore, the question of whether Vives is entitled to damages for the wrongful arrest must proceed to trial.

### B. Are the Detectives Entitled to Qualified Immunity?

 Viewing the complaint in the "light most favorable" to Vives, *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, there can be no doubt that "the facts alleged show the officer's conduct violated a constitu-

---

9. Vives does not raise, and I therefore do not address, whether section 240.30(1) is unconstitutional to the extent it prohibits communications that are intended to "harass" or "threaten." *See Horne v. Coughlin,* 178 F.3d 603, 606 (2d Cir.1999) (courts should avoid issuing advisory opinions on constitutional issues where unnecessary for adjudication of the case before the court).

10. Defendants further argue that section 240.30(1) was constitutional at the time of Vives's arrest. *See* Defendants' Reply Memo-

randum of Law in Further Support of Their Motion for Summary Judgment at 5. On the contrary, section 240.30(1) was *not* constitutional at the time Vives was arrested. The fact that the legislature enacted the statute, and that it has not previously been declared facially unconstitutional by a court of law, did not somehow make the statute constitutional up until the date of this Opinion and Order. The challenged portion of section 240.30(1) has been unconstitutional since its enactment.

tional right." *Id.* The undisputed facts establish that the officers *did* violate Vives's First and Fourth Amendment rights. *See supra* Part III.A. I therefore turn directly to the second step of the *Saucier* inquiry, and consider whether these rights were clearly established in the circumstances of this case, such that "it would [have] been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201–02, 121 S.Ct. 2151.

In light of this country's long history of protecting free speech, as well as more than fifteen years of jurisprudence specifically questioning the constitutionality of section 240.30(1), I cannot conclude that detectives Li's and Lui's conduct was reasonable in these circumstances. While police officers cannot be expected to analyze state laws and determine whether they are constitutional, detectives Li and Lui arguably had notice that section 240.30(1) was unconstitutionally over broad. *See Hope,* 536 U.S. at 740–41, 122 S.Ct. 2508. Although the statute has never before been declared unconstitutional on its face, it has been declared unconstitutional as applied, *see Dupont,* 486 N.Y.S.2d at 177, and a very similar statute was struck down more than ten years ago, *see Dietze,* 75 N.Y.2d at 53, 550 N.Y.S.2d 595, 549 N.E.2d 1166. Moreover, this Court previously found the statute to be "utterly repugnant to the First Amendment." *Schlagler,* 985 F.Supp. at 421. These rulings indicated that a declaration of unconstitutionality was inevitable, and under these circumstances, the defendants may be said to have had fair notice of the unconstitutionality of section 240.30(1). *See Hope,* 536 U.S. at 740–41, 122 S.Ct. 2508; *In re State Police Litig.,* 88 F.3d at 123.

Additionally, there is some evidence that detectives Li and Lui were not acting in good faith when they arrested Vives. Detective Li specifically noted in his report prior to the arrest that nothing contained in Vives's mailing to Hoffman was threatening. *See* 4/3/02 NYPD Report. And when Vives asked Li and Lui why they wanted him to accompany them to the police precinct, Li told Vives that Mayor Bloomberg wanted to see him. *See* Li Dep. at 69. Though Li now claims that he made this statement because Bloomberg is technically his "boss," *see id.,* Li's conduct raises some concerns with respect to whether he was acting properly and in good faith.

Viewing all of these facts in the light most favorable to plaintiff, I cannot find that "no rational jury could fail to conclude that it was reasonable for defendants to believe" that arresting Vives would not violate his First and Fourth Amendment rights. *LaBounty v. Coughlin,* 137 F.3d 68, 74 (2d Cir.1998) (reversing grant of qualified immunity where the right was clearly established at the time of the alleged violation, but there was some doubt as to whether a "reasonable official would understand that what he did violates that right") (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). Of course, because qualified immunity is an affirmative defense, *see Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), detectives Li and Lui will have an opportunity to prove at trial that their actions were reasonable under the circumstances.

**C. Injunctive Relief**

█ Vives seeks an injunction enjoining the NYPD, through Commissioner Raymond Kelly, from "arresting persons pursuant to section 240.30(1) of the Penal Law of the State of New York for the mailing of nonthreatening materials that are protected by the First Amendment when such materials are mailed with the intent to 'annoy' or to 'alarm.'" Compl. at *ad damnum* clause ¶ 5. Although the Court has no doubt that the enforcement

of section 240.30(1) with respect to "annoying" or "alarming" conduct is unconstitutional as applied to anyone, *see infra* Part III.A.2, it is outside the scope of the Court's power to enjoin the NYPD from enforcing the statute against non-parties. *See Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *United States Dep't of Defense v. Meinhold,* 510 U.S. 939, 114 S.Ct. 374, 126 L.Ed.2d 324 (1993) (*"Meinhold I"*) (staying injunction, pending appeal, to the extent it granted relief to non-parties); *Meinhold v. United States Dep't of Defense,* 34 F.3d 1469, 1480 (9th Cir.1994) (*"Meinhold II"*) (finding injunction over broad where it enjoined the Department of Defense from denying enlistment to anyone based on sexual orientation, and limiting injunction to the Department's actions with respect, to the plaintiff); *see also Hayes v. North State Law Enforcement Officers Assn.,* 10 F.3d 207, 217 (4th Cir. 1993) ("Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation.").

Therefore, the NYPD, through Commissioner Kelly, is hereby enjoined from enforcing section 240.30(1) against plaintiff Carlos Vives, to the extent such enforcement is based on his intentionally communicating, or causing to be communicated, by mechanical or electronic means or otherwise, with a person, anonymously or otherwise, by telephone, or by telegraph, mail or any other form of written communication, in a manner that is likely to cause and intended to cause annoyance or alarm. The NYPD, through Commissioner Kelly, is further directed to return to Vives all documents reflecting his arrest and detention, and expunge all computer information reflecting the arrest and detention.

I note that the ever-growing number of courts holding this statute unconstitutional suggests that the state and local police officers and prosecutors would be well-advised—after fourteen years—to cease arrests and prosecutions under this section.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted in part and denied in part. The Clerk of the Court is directed to close these motions. The issues of 1) the amount of damages Vives is entitled to for the First Amendment and New York Constitution § 8 violations, 2) whether Vives is entitled to damages for the Fourth Amendment, New York Constitution § 12, and New York common law violations, and the amount of damages for those violations, if any, and 3) whether detectives Li and Lui are personally liable, must proceed to trial. A conference is scheduled for December 2, 2004, at 4 p.m. in courtroom 15C.